642 A.2d 472

**LAUREL PIPE LINE COMPANY, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, BOARD OF FINANCE AND REVENUE, Appellee.**

Supreme Court of Pennsylvania.

Argued May 5, 1993.

Decided May 26, 1994.

206

George T. Bell, Harrisburg, for appellant.

Michael A. Roman, Dep. Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

This is a direct appeal from the Order of the Commonwealth Court which affirmed the Order of the Board of Finance and Revenue. The Commonwealth Court and the Board of Finance and Revenue refused to characterize as nonbusiness income the gain on the sale of an idle pipeline and related assets by Appellant, Laurel Pipe Line Company ("Laurel"). For the reasons that follow, we reverse.

Laurel and the Board of Finance and Revenue entered into a stipulation of facts which the Commonwealth Court adopted as the factual findings in this case. The stipulation indicates that Laurel is an Ohio corporation engaged in the business of transporting refined petroleum products from refinery and pipeline connections from the Philadelphia area to Pittsburgh and intermediate points. From 1983 until 1986, Laurel also operated a pipeline from Aliquippa, Pennsylvania, to Cleveland, Ohio.

As a result of shifting distribution patterns and insufficient volume, Laurel discontinued operation of the Aliquippa–Cleveland pipeline in 1983. On December 22, 1986, Laurel sold this pipeline, along with related assets,[1] for a gain of $3,766,047. Fifteen days later, Laurel's Board of Directors declared dividends equal to the entire after-tax net proceeds resulting from the sale and distributed those proceeds to Laurel's stockholders. None of the proceeds were used by Laurel to acquire any asset for use in future business operations or to generate income for use in future business operations.

At the time that it filed its 1986 Pennsylvania corporate net income tax return,[2] Laurel treated the gain from the sale of the Aliquippa–Cleveland pipeline as nonbusiness income and

---

1.  The assets included related equipment, land, rights of way, buildings, oil tanks, and similar real and personal property. For simplicity, we will refer to all property included in the sale as the "Aliquippa–Cleveland pipeline" or the "pipeline."

2.  As a result of changes in corporate ownership during the 1986 tax year, the short tax year at issue in this case is from December 1, 1986, to December 22, 1986.

allocated the gain between Pennsylvania and Ohio.[3]   On June 2, 1988, the Pennsylvania Department of Revenue entered into a settlement with Laurel whereby the entire gain from the sale of the pipeline was reclassified as business income subject to apportionment.[4]   Laurel filed a Petition for Resettlement with the Board of Appeals which was denied.   A Petition for Review was then filed by Laurel with the Board of Finance and Revenue.   That petition was also denied.

On appeal to the Commonwealth Court, Laurel raised three alternative issues concerning whether all or a part of the gain from the sale of the Aliquippa–Cleveland pipeline was taxable by the Commonwealth.   The Commonwealth Court rejected each argument *seriatim* and affirmed the Order of the Board. We now reverse.

Laurel's first contention is that the gain on the sale of the Aliquippa–Cleveland pipeline is nonbusiness income which should be allocated between Pennsylvania and Ohio based upon the situs of the property.   For corporate net income tax purposes, Pennsylvania divides income into two categories: business income and nonbusiness income.   72 P.S. § 7401(3)2.(a)(1)(A), (D).   The first category, business income, is defined as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."   72 P.S. § 7401(3)2.(a)(1)(A).   Business income of pipeline companies is apportioned to Pennsylvania

3.   The gain was allocated to Pennsylvania using the ratio of the length of pipeline located in Pennsylvania (approximately 42.3 miles) to the total length of pipeline (110 miles).   As a result, 38.46% (42.3/110) of the total gain or $1,448,653 was allocated to Pennsylvania.   Record at 6a.

4.   Pursuant to section 401(3)2.(c)(1) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, No. 2 (codified as amended at 72 P.S. § 7401(3)2.(c)(1)), pipeline companies apportion business income to Pennsylvania by using the ratio of revenue barrel miles in Pennsylvania to the total revenue barrel miles everywhere.   One revenue barrel mile is equal to the receipts derived from the transportation of one barrel of liquid property for one mile.   *Id.*

according to a single factor which is the revenue-barrel ratio.[5] 72 P.S. § 7401(3)2.(c).

The other category of income, nonbusiness income, consists of "all income other than business income." 72 P.S. § 7401(3)2.(a)(1)(D). Nonbusiness income is "allocated to the situs of the income producing property." *Welded Tube Co. of America v. Commonwealth,* 101 Pa.Commw. 32, 41, 515 A.2d 988, 993 (1986).

Notwithstanding the instant case, the only Pennsylvania decision that has addressed the distinction between business and nonbusiness income is *Welded Tube Co. of America v. Commonwealth,* 101 Pa.Commw. 32, 515 A.2d 988 (1986). In *Welded Tube,* the taxpayer operated two plants for the manufacture of tubing, one in Philadelphia and one in Chicago. In 1979, the Philadelphia plant was sold for a gain and the taxpayer treated the gain as business income to be apportioned. The Department of Revenue disagreed and characterized the gain as nonbusiness income to be allocated entirely to Pennsylvania.

On appeal, the Commonwealth Court reversed and found that the gain on the sale of the Philadelphia plant was business income. *Id.* at 46, 515 A.2d at 995. In so holding, the court cited cases from other jurisdictions and stated that the two clauses that comprised the statutory definition of business income, 72 P.S. § 7401(3)2.(a)(1)(A), contained two alternative tests for determining "whether certain income is properly classified as business income or nonbusiness income." *Id.* at 42, 515 A.2d at 993.

The first test for classifying income is the transactional test which is derived from the first clause of the statutory definition: "income arising from transactions and activity in the regular course of the taxpayer's trade or business." *Id.* Under the transactional test, "the particular transaction giving rise to the income is measured against the 'frequency and regularity' of similar transactions in the past practices of the business." *Id.* at 43, 515 A.2d at 993 (citation omitted).

5. See footnote 4, *supra.*

The parties in this case agree that the gain on the sale of the Aliquippa–Cleveland pipeline does not meet the transactional test. Therefore, the only issue concerning the classification of the gain as business or nonbusiness income is whether it meets the functional test.

The functional test is based upon the second clause of the statutory definition: "income from 'tangible and intangible property if the acquisition, management, and disposition of the property constitute *integral parts* of the taxpayer's regular trade or business.'" *Id.* at 43, 515 A.2d at 993–94. Income meets the functional test if the gain arises from the sale of an asset which produced business income while it was owned by the taxpayer. *Id.* at 43–44, 515 A.2d at 994. The court in *Welded Tube* found that both the transactional and the functional tests were met because it was a regular practice of the taxpayer to acquire property in the expansion of its business and because the gain on the sale was reinvested in the business. *Id.* at 44–46, 515 A.2d at 994–95.

In the court below, Laurel argued that the sale of the Aliquippa–Cleveland pipeline constituted a partial liquidation of the company's business and was not a transaction in which it regularly engaged. The Commonwealth Court did not directly address this issue, but instead found that the gain on the sale of the pipeline met the functional test. *Laurel Pipe Line Co. v. Commonwealth,* 150 Pa.Commw. 135, 144, 615 A.2d 841, 846 (1992). The court correctly noted that Laurel "operated the Aliquippa–Cleveland pipeline from 1976 to 1983" and that "[i]n its Pennsylvania corporate net income tax filings for that time span, [Laurel] reported net revenues from the operation of the pipeline as business income subject to apportionment. Therefore, the pipeline produced business income while [Laurel] owned it." *Id.* The court then stated:

the Aliquippa–Cleveland pipeline was only one of the pipelines owned and operated by [Laurel]. When the Aliquippa–Cleveland pipeline became unprofitable and was idled in 1983, the sale of the pipeline was necessary to [Laurel]'s

continued, overall business viability and was thus an integral part of [Laurel]'s regular course of business.

*Id.*

The statutory definition of business income requires that "the acquisition, management, *and disposition* of the property constitute integral parts of the taxpayer's *regular* trade or business operations." 72 P.S. § 7401(3)2.(a)(1)(A) (emphasis added). The Commonwealth Court has thus stated that a singular disposition of an unprofitable pipeline is an integral part of the company's regular business because, if not sold, the company's other business would suffer financially. We disagree with this conclusion.

The Aliquippa–Cleveland pipeline had been idle for over three years prior to the time that it was sold. In our view, the pipeline was not disposed of as an integral part of Laurel's regular trade or business. Rather, the effect of the sale was that the company liquidated a portion of its assets. This is evidenced by the fact that the proceeds of the sale were not reinvested back into the operations of the business, but were distributed entirely to the stockholders of the corporation. Although Laurel continued to operate a second, independent pipeline, the sale of the Aliquippa–Cleveland pipeline constituted a liquidation of a separate and distinct aspect of its business.[6]

Laurel also takes exception to the conclusion of the Commonwealth Court that the pipeline was sold because it was unprofitable or because the income from the sale was needed to maintain the company's viability. The Commonwealth responds that "such a conclusion is clearly a fair inference from the stipulated facts that the assets were 'shut down' [sic] because of 'shifting distribution patterns and insufficient volume.'" Brief of Appellee at 10. Based upon our review of the record, we find this to be a tenuous inference.

6. The stipulation of facts indicates that "[w]hile essentially all pipelines are interlocking, the Aliquippa-to-Cleveland pipeline is not an adjunct of Laurel's Pittsburgh-to-Philadelphia pipeline, but rather is separated by pipeline(s) owned by other entities." Record at 6a.

The Commonwealth urges us to view the three year period from the shutdown of the pipeline until its final disposition as indicative of the fact that the asset was unattractive to potential buyers and therefore difficult to sell. There is nothing in the record indicating the date on which the pipeline was placed on sale. We may not therefore presume that the three year period of dormancy necessarily meant that the pipeline was for sale during that period. Moreover, the fact that the pipeline was sold for a gain of $3,766,047 undercuts the Commonwealth's assertion that the pipeline was an "uneconomic" asset; it was apparently an attractive and valuable asset to the subsequent purchaser.

The conclusion of the Commonwealth Court that the sale of the pipeline was necessary to maintain Laurel's "continued, overall business viability" is equally unsupported by the record. The gain on the sale was not reinvested into assets that could be used by the company nor was it invested in financial securities that would generate income for the company. Record at 9a. To the contrary, dividends were declared equal to the amount of the entire after-tax net proceeds from the sale of the pipeline and distributed to the shareholders of the corporation. Record at 9a–10a. It is unlikely that a company whose "overall business viability" was in question would undertake such an action.

In making the determination that the gain from the sale of the Aliquippa–Cleveland pipeline is nonbusiness income, we are persuaded by the disposition of a factually similar case in another jurisdiction involving a company in the business of laying pipelines. In *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (N.M.Ct.App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975), the court held that the Commissioner of Revenue erred when he reclassified income derived from an equipment liquidation sale as business income. The company was engaged in pipeline work of two types: one type involved laying small diameter pipelines and the other involved laying large diameter pipelines. In 1973, the company experienced a reorganization which was accomplished in part by the liquidation of the large diameter pipe-

line business. The related equipment was sold at auction in Texas and Nevada. The gain on the sale was classified by the company as nonbusiness income to be allocated to Texas and Nevada.

The New Mexico Court of Appeals agreed that the gain on the sale of the large diameter pipeline equipment constituted nonbusiness income. By interpreting statutory definitions of business and nonbusiness income identical to those of Pennsylvania, the court "fail[ed] to see how the acquisition, management and disposition of the property constituted integral parts of the taxpayer's regular trade or business." 88 N.M. at 524, 543 P.2d at 492. The court reasoned that the "taxpayer was not in the business of buying and selling pipeline equipment and, in fact, the transaction in question was a partial liquidation of taxpayer's business and a total liquidation of taxpayer's [large diameter pipeline] business.... This sale contemplated a cessation of taxpayer's [large diameter pipeline] business." *Id.*

Although Laurel, in the case at bar, continued to operate a separate, independent pipeline, the sale of the Aliquippa–Cleveland pipeline and distribution of the resultant gain constituted a liquidation of a separate aspect of Laurel's business. Laurel sold one of its two major assets and consequently divested itself from the pipeline business in the Aliquippa–Cleveland geographical region. While not a complete liquidation, the sale of the pipeline was a liquidation of a separate and distinct aspect of its business to the same extent that the taxpayer's sale of its large diameter pipeline business was a liquidation in *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue, supra.*

The Commonwealth attempts to distinguish *McVean & Barlow* by arguing that the court in that case relied upon the testimony of a company officer who said that the liquidation had changed the basic nature of the company's business. The Commonwealth asserts that the record does not contain a similar claim by Laurel that the nature of its business was affected by the sale of the Aliquippa–Cleveland pipeline. However, the Commonwealth has overlooked another impor-

tant aspect of the company officer's testimony that factored into the court's decision in *McVean & Barlow.* The company officer testified that the partial liquidation transaction in question "changed the geographical environment of where our business could operate. . . ." 88 N.M. at 524, 543 P.2d at 492. The stipulation of facts in the instant case indicates that

> [s]ubsequent to the sale of the Aliquippa-to-Cleveland pipeline and related assets in 1986, Laurel had no other pipeline or equipment to transport petroleum products in the Aliquippa-to-Cleveland region, and Laurel has not operated as a pipeline company, or in any other business capacity, in that region since 1983.

Record at 10a. Thus, the same circumstance of geographical change is present in both cases. Furthermore, the totality of the circumstances surrounding the sale of the Aliquippa–Cleveland pipeline has persuaded us that the transaction is one that can be characterized as a partial liquidation which has changed the structure of the taxpayer's business.

Based upon the foregoing, we conclude that the gain on the sale of the Aliquippa–Cleveland pipeline is nonbusiness income as set forth in 72 P.S. § 7401(3)2.(a)(1)(D).

Laurel next argues that the gain on the sale of the Ohio segment of the Aliquippa–Cleveland pipeline should be excluded from its taxable base for Pennsylvania corporate net income tax purposes based on *Commonwealth v. ACF Industries, Inc.,* 441 Pa. 129, 271 A.2d 273 (1970). In *ACF Industries,* this Court articulated a three-part analysis to help determine whether an asset is unrelated to a multistate taxpayer's business activities in Pennsylvania. *Id.* at 142–43, 271 A.2d at 280. An asset determined to be unrelated is excluded from taxation by the Commonwealth. *Id.* However, we need not address this argument based upon our conclusion that the sale of the pipeline is nonbusiness income to be allocated between Pennsylvania and Ohio. Laurel will only be taxed on the gain on the sale of the assets located in Pennsylvania; nothing will be apportioned from the gain on the Ohio segment of the pipeline.

Finally, Laurel contends that the Commonwealth's attempt to tax the gain on the Ohio segment of the Aliquippa–Cleveland pipeline violates article I, section 8, clause 3 of the United States Constitution by unfairly apportioning income to Pennsylvania. As stated above, our disposition of the threshold issue in this case obviates the need to address any of Laurel's alternative arguments concerning the apportionment of the gain of the Ohio segment of the pipeline.

We therefore hold that the gain from the sale of the Aliquippa–Cleveland pipeline and related assets is nonbusiness income to be allocated to Pennsylvania as stipulated by the parties.[7] Accordingly, the Order of the Commonwealth Court is reversed.

LARSEN, J., did not participate in the decision of this case.

MONTEMURO, Senior Justice, was an appointed Justice of the Court at the time of argument.*

---

7. The stipulation of facts indicates that

[i]n the event the Court determines that the net gain of $3,766,047 resulting from the sale in 1986 of the pipeline and related assets is non-business income, as reported by Laurel, rather than business income as settled by the Department, $1,448,653 of the gain is to be attributable to Pennsylvania property and allocated to Pennsylvania as non-business income, and $2,317,394 of the gain is to be attributable to Ohio property; none of the gain is to be considered business income. Under such circumstances, Laurel's taxable income and corresponding tax for Pennsylvania purposes for the short taxable year, ended December 22, 1986, would be computed as follows:

| | |
|---|---:|
| Federal Taxable Income | $3,973,094 |
| Net Adjustments | (21,916) |
| Taxable Income | 3,951,178 |
| Less: Total Non–Business Income | (3,766,047) |
| Income to be Apportioned | 185,131 |
| PA Apportionment Factor | x .994284 |
| Income Apportioned to PA | 184,073 |
| Non–Business Income Allocated to PA | 1,448,653 |
| PA Taxable Income | 1,652,726 |
| Rate of Tax | .095 |
| Corporate Net Income Tax | $ 155,109 |

Record at 8a–9a.

* Mr. Justice Montemuro is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket No. 94 R1800, due to the