**CANTEEN CORPORATION,**
**Petitioner,**

v.

**COMMONWEALTH of Pennsylvania,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2001.
Decided Feb. 8, 2002.

Robert R. Batt, Philadelphia and Peter L. Faber, New York, for petitioner.

Clinton G. Smith, Harrisburg, for respondent.

Before SMITH–RIBNER, Judge, KELLEY, Judge,[1] and JIULIANTE, Senior Judge.

KELLEY, Judge.

Canteen Corporation ("Canteen") petitions for review of an order of the Board of Finance and Revenue involving the settlement of Canteen's corporate net income tax liability for the period from January 1, 1994 through June 17, 1994 (Tax Period) under Article IV of the Tax Reform Code of 1971 (Tax Code).[2] We affirm.

Canteen is a corporation organized under the laws of the State of Delaware with headquarters and commercial domicile in North Carolina and operations in Pennsylvania and 47 states. Canteen operates a food service business consisting of vending machines, concession sales and cafeteria operations.

Canteen was at all relevant times a wholly-owned subsidiary of I.M. Vending, Inc. (Vending). Vending was at all relevant times the sole owner of all the issued and outstanding shares of Canteen's stock. Vending was in turn a wholly-owned subsidiary of Canteen Holdings, Inc (Holdings). Holdings was at all relevant times a subsidiary of Flagstar Companies, Inc.

On June 17, 1994, Holdings, the parent company of Vending, sold all of the stock of Vending to Compass Holdings, Inc. (Compass), an unrelated corporation (the "transaction"). Canteen, a subsidiary of

Vending was not a party to the transaction.

Following the transaction, Holdings and Compass jointly filed an election with the IRS to have the sale of Vending stock treated as a sale of assets for federal tax purposes pursuant to Section 338(h)(10) of the Internal Revenue Code (IRC), 26 U.S.C. § 338(h)(10). As a consequence, Canteen was deemed, for federal income tax purposes, to have sold all of its assets in the transaction and to have immediately thereafter distributed the proceeds to its parent corporation, Vending, in complete liquidation. At no time prior to or subsequent to the transaction did Canteen in actuality sell or otherwise dispose of its assets in Pennsylvania or elsewhere other than in the routine course of its business.

■ Canteen filed its Pennsylvania net income tax return for the Tax Period, reporting, *inter alia*, gain from the deemed sale of assets in liquidation of its business as *nonbusiness income*. On settlement, the Department of Revenue treated that gain as *business income*, and as a result, increased Canteen's tax liability. Canteen timely petitioned the Board of Appeals for resettlement of its tax liability, which was denied. Canteen reasserted its position by filing a petition for review with the Board of Finance and Revenue, which denied the petition. This appeal now follows.[3] The sole issue presented for our review is whether certain income from the deemed sale of assets constitutes "business income" within the meaning of Section 401(3)2.(a)(1)(A) of the Tax Code, 72 P.S. § 7401(3)2.(a)(1)(A), or "nonbusiness in-

---

1. The decision in this case was reached prior to the date that Judge Kelley assumed the status of senior judge on December 31, 2001.

2. Act of March 4, 1971, P.L. 6, as amended, 72 P.S. §§ 7101–10004.

3. In appeals from decisions of the Board of Finance and Revenue, our scope of review is broad because we function as a trial court, even though such cases are heard in our appellate jurisdiction. *Norris v. Commonwealth*, 155 Pa.Cmwlth. 423, 625 A.2d 179, 182 (1993).

come" within the meaning of Section 401(3)2.(a)(1)(D) of the Tax Code, 72 P.S. § 7401(3)2.(a)(1)(D).

Canteen contends that the Board of Finance and Revenue erred in treating income derived from the deemed sale of its assets as business income as opposed to nonbusiness income. We disagree.

■ Article IV of the Tax Code imposes a corporate net income tax on all corporations for the privilege of (i) doing business in this Commonwealth; or (ii) carrying on activities in this Commonwealth; (iii) having capital or property employed or used in this Commonwealth; or (iv) owning property in this Commonwealth. Section 402 of the Tax Code, 72 P.S. § 7402. Since the corporate net income tax is an excise tax on the privilege of earning income, the Commonwealth may constitutionally subject to tax only that part of the income reasonably related to the privilege exercised in Pennsylvania. *Hellertown Manufacturing Co. v. Commonwealth*, 25 Pa.Cmwlth. 90, 358 A.2d 424 (1976), *aff'd*, 480 Pa. 358, 390 A.2d 732 (1978), *overruled in part by Paris Manufacturing Co. v. Commonwealth*, 505 Pa. 15, 476 A.2d 890 (1984). The Tax Code establishes a system of allocation and apportionment for the determination of net income of corporations engaged in taxable activities within and outside the Commonwealth. *SmithKline Beckman Corp. v. Commonwealth*, 85 Pa.Cmwlth. 437, 482 A.2d 1344 (1984), *aff'd*, 508 Pa. 359, 498 A.2d 374 (1985). The starting point for calculating a corporation's corporate net income tax is the corporation's federal tax return, or if no return was filed with the federal government, a pro forma report showing such information as would have been contained in a return to the federal government had one been made. *See* Section 403 of the Tax Code, 72 P.S. § 7403. The corporate net income tax is imposed on the taxable income for the calendar year or fiscal year as returned to and ascertained by the federal government. Section 401(3) of the Tax Code, 72 P.S. § 7401(3).

For corporate net income tax purposes, Pennsylvania divides income into two categories: business income and nonbusiness income. *Laurel Pipe Line Co. v. Board of Finance and Revenue*, 537 Pa. 205, 208, 642 A.2d 472 (1994). Under the Tax Code, **"business income"** is defined as income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.[4] Section 401(3)2.(a)(1)(A) of the Tax Code. **"Nonbusiness income"** is defined to include all income other than business income. Section 401(3)2.(a)(1)(D) of the Tax Code.

The classification of income as either business or nonbusiness income may significantly affect a corporation's tax liability. Under the Pennsylvania apportionment formula applicable to business income, the amount of a corporation's income that Pennsylvania taxes is based upon the ratio of the taxpayer's payroll, property, and receipts within Pennsylva-

---

4. By Act of June 22, 2001, P.L. 353, the General Assembly amended the definition of "business income" as follows:

income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if either the acquisition, the management or the disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations. The term includes all income which is apportionable under the Constitution of the United States.

nia to taxpayer's total payroll, property, and receipts. Section 401(3)2.(a) of the Tax Code, 72 P.S. § 7401(3)2.(a). Pennsylvania's share of nonbusiness income of a multistate corporation is generally limited to gain on the sale of real and tangible personal property located in Pennsylvania. Section 401(3)2.(a)(4)-(8) of the Tax Code, 72 P.S. § 7401(3)2.(a)(4)-(8); *Welded Tube Co. of America v. Commonwealth*, 101 Pa. Cmwlth. 32, 515 A.2d 988, 992 (1986) (Nonbusiness income is "allocated to the situs of the income producing property.").

■ In determining whether the gain from the sale of a corporation's assets is business income or nonbusiness income, Pennsylvania recognizes two tests: the "transactional test" and the "functional test." *Ross–Araco Corporation v. Commonwealth*, 544 Pa. 74, 674 A.2d 691 (1996); *Laurel Pipe Line; Welded Tube.* The transactional test is derived from the first clause of the statutory definition: "income arising from transactions and activity in the regular course of the taxpayer's trade or business." *Id.* This test measures the particular transaction against the frequency and regularity of similar transactions in the past practices of the business. *Id.* Under the transactional test, gain is treated as business income if the taxpayer regularly engages in the type of transaction producing the gain. *Id.* The taxpayer's subsequent use of the income is also relevant in determining whether gain is business income. *Id.*

■ The functional test is based upon the second clause of the statutory definition: "income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business." *Id.* Under the functional test, gain is treated as business income if the assets disposed of were used to generate business income, even if their sale is not a regular incident of the business. *Id.* The extraordinary nature or infrequency of the transaction is irrelevant for purposes of the functional test. *Id.*

In *Welded Tube*, this Court applied both the transactional test and the functional test in addressing the classification of gain realized when a corporation had sold off one of its two manufacturing facilities pursuant to a corporate reorganization. While recognizing that the gain from the sale of assets pursuant to a business liquidation is nonbusiness income because it is income from "a transaction of an extraordinary nature outside the regular course of the taxpayer's trade or business," we found that the taxpayer's sale of the manufacturing facility was not a liquidation. *Id.* In concluding that the sale generated business income under both the transactional and functional tests, this Court focused on the nature of the transaction (noting that it did not result in the cessation of corporate activities in that business) and how the sale proceeds were used (noting that the gain from the sale was invested in ongoing business operations). *Id.*

In *Laurel Pipe Line*, the Pennsylvania Supreme Court applied the transactional and functional tests in determining whether the gain realized on the partial liquidation of a business constituted business income. Therein, the taxpayer had operated two petroleum pipelines. One pipeline originated in Philadelphia, Pennsylvania, and terminated in Pittsburgh, Pennsylvania, the other originated in Aliquippa, Pennsylvania and terminated in Cleveland, Ohio. In 1983, as a result of shifting distribution patterns and insufficient volume, the taxpayer discontinued the operation of the Aliquippa Cleveland pipeline. The Aliquippa Cleveland pipeline and related assets were sold three

years later and all of the sale proceeds were distributed to taxpayer's stockholders.

The Supreme Court concluded that the sale of Aliquippa Cleveland pipeline was not an "integral part" of the taxpayer's regular trade or business. *Id.* Although the taxpayer "continued to operate a second, independent pipeline, the sale of the Aliquippa Cleveland pipeline constituted a liquidation of a separate and distinct aspect of its business." *Id.* at 221, 642 A.2d at 475. The liquidation aspect of the sale was the controlling consideration. Thus, the Court held that the gain resulting from the sale of the pipeline and related assets constituted nonbusiness income because the statute required that the disposition of the property be an integral part of the taxpayer's regular business in order for it to be considered business income. *Id.*

In 1996, the Pennsylvania Supreme Court revisited the business/nonbusiness classification in *Ross–Araco*. *Ross–Araco* involved the gain on the sale of property, which was owned by a security company and regularly pledged to secure performance bonds. The Supreme Court noted that acquisitions and sales of real property may generate business income when such transactions are regularly engaged in by the taxpayer, but found that the acquisition and disposition of real property was not an integral part of the taxpayer's ongoing business. *Id.* Thus, the Court determined that the gain on the sale of property was nonbusiness income. *Id.*

While these cases stand for the legal proposition that gain occurring from the sale of assets pursuant to business liquidation does not constitute business income, these cases can be readily distinguishable from the case at hand in that they involved or referred to actual liquidations. The case before us, however, does not involve an actual liquidation but a "deemed liquidation" as provided for under federal tax law.

Under federal law, where a parent corporation (seller) sells the stock of its subsidiary (target) to another corporation (buyer), the seller and the buyer may elect under Section 338(h)(10) of the IRC to treat the stock sale as if the subsidiary, while owned by the seller, sold all of its assets in complete liquidation. 26 U.S.C. § 338(h)(10). The subsidiary then recognizes a gain or loss on the deemed sale of its assets, which is included in the seller's consolidated federal tax return. *Id.* The subsidiary is deemed to have liquidated while owned by the seller. *Id.*

The effect of Section 338(h)(10) is to create a fiction in which the amount paid for the shares of stock is treated as having been paid for the assets of the subject corporation for federal tax purposes. The sold subsidiary reports the gain or loss on the deemed sale of its assets based upon the difference between the sale proceeds and the tax cost (basis) of those assets. For federal income tax purposes, the transaction is treated not as a purchase of the target's stock, but, rather, as if the target had sold its assets and distributed the sale to its parent corporation in complete liquidation, even though no liquidation of the target corporation actually occurs. By treating the sale of stock as the sale of assets, the assets take on a new tax basis equal generally to the price paid by the buyer for the subsidiary's stock and since that purchase price presumably exceeds their historic cost basis in the hands of the subsidiary,[5] the post-transaction de-

---

5. If a subsidiary's assets had an historic cost basis that was less than their fair market value, the seller and the buyer would presum-

ably not make a Section 338(h)(10) election and the assets would keep their historic tax basis. Canteen's Brief, p. 23.

preciation deductions with respect to the subsidiary's assets are increased. The deemed distribution of the sale proceeds from the subsidiary to the parent is tax-free and the parent's actual sale of the subsidiary's stock is ignored for federal tax purposes.[6]

For state tax purposes, there is no dispute that gain recognized by a subsidiary, as a result of a parent corporation's election under the IRC to treat its sale of all of the subsidiary's stock as the sale of the subsidiary's assets and to file consolidated income tax return, is "income." The question now before us is what effect does this federal election have for Pennsylvania tax purposes. In other words, does this income constitute "business income" or "nonbusiness income"?

■ Although the starting point for the determination of corporate net income under the Tax Code is taxable income as reported on the federal tax return, Pennsylvania is not bound to federal income tax treatment. *Tool Sales and Service Co., Inc. v. Commonwealth*, 536 Pa. 10, 637 A.2d 607 (1993), *cert. denied, Tom Mistick & Sons v. Pennsylvania*, 513 U.S. 822, 115 S.Ct. 85, 130 L.Ed.2d 37 (1994); *Tygart Resources, Inc. v. Commonwealth*, 134 Pa. Cmwlth. 168, 578 A.2d 86 (1990), *aff'd*, 530 Pa. 199, 607 A.2d 1074 (1992). While federal law permits a corporate taxpayer to file a consolidated return and to elect to treat the sale stock as a sale of assets for federal tax purposes, such federal tax treatment is not determinative of the status of this gain under Pennsylvania tax law.[7]

6. The benefit of this election, as aptly explained by Canteen, is that if a buyer buys a business by buying the stock of the corporation that owns it, the tax basis of the target corporation's assets will ordinarily not change and the future depreciation deductions attributable to those assets will be based on their historic cost in the target corporation's hands. Canteen's Brief, p. 22. However, if the buyer buys the assets directly from the target corporation, they will acquire a new cost basis equal to the purchase price and if their fair market value exceeds their historic tax basis in the hands of the target corporation, the depreciation deductions available to the buyer will be greater than they would be if the buyer bought the target corporation's stock instead of buying the assets directly. *Id.*

7. In Canteen's supplemental brief, Canteen directs our attention to three recent cases in outside jurisdictions involving the characterization of income as business or nonbusiness income: *Kemppel v. Zaino*, 91 Ohio St.3d 420, 746 N.E.2d 1073 (2001); *May Department Stores Co. v. Indiana Department of State Revenue*, 749 N.E.2d 651 (Ind.Tax 2001); and *Hoechst Celanese Corporation v. Franchise Tax Board*, 25 Cal.4th 508, 106 Cal.Rptr.2d 548, 22 P.3d 324 (2001). Unfortunately, none of these cases involve the classification of gain resulting from a Section 338(h)(10) election.

In *Kemppel*, the Ohio Supreme Court examined whether income generated from the sale of intangible personal property as part of a business liquidation was business or nonbusiness income. The Court held that the sale of assets as part of the liquidation of a business produces nonbusiness income where the sale proceeds are distributed to shareholders and not reinvested in the business even though the sold assets had been used in the business. *Id.* The sale of property is not an integral part of the regular course of the trade or business operation if the sale terminates the trade or business operation. *Id.*

In *May Department Stores*, the Indiana Tax Court examined the characterization of gain on the sale of assets pursuant to the settlement of an anti-trust action as business or nonbusiness income. May Department Stores acquired all of the stock of Associated Department Stores. *Id.* Both companies owned and operated a chain of department stores in the City of Pittsburgh. *Id.* To prevent a department store monopoly, Associated was required to sell its Pittsburgh department store chain. *Id.* The Indiana Tax Court held that the income from the sale was nonbusiness income upon concluding that the disposition of Associated's Pittsburgh department store chain was neither necessary nor an essential part of Associated's department store retailing business operations. *Id.*

While the gain on the sale of assets in connection with the liquidation of a business, whether total or partial, normally constitutes nonbusiness income in Pennsylvania, this principle does not apply to a "deemed sale" of assets in liquidation under Section 338(h)(10) election. Pennsylvania does not recognize the Section 338(h)(10) election for corporate net income tax purposes. In fact, the Tax Code regulations specifically provide that taxable income generated as a result of a Section 338 election is subject to Pennsylvania Corporate Net Income Tax and is treated as "business income" apportionable to Pennsylvania.[8] 61 Pa.Code § 153.81(d)(1). Section 153.81(d)(1) provides:

(d) Effect of election on tax liability.

(1) Corporate Net Income Tax. Taxable income generated as a result of a section 338 election is subject to Pennsylvania Corporate Net Income Tax and treated as business income subject to apportionment, if the taxpayer was entitled to apportionment for the taxable year ending immediately prior to the acquisition date. The income consequences of a Section 338 election shall be reflected on a separate company basis and not as part of a combined or consolidated report.

This regulation is consistent with Pennsylvania statutory and case law as the transaction involved is not an actual liquidation.[9]

■■■ The discrepancy between federal and state income tax treatment is not illogical when the difference between the two situations is examined. Under the federal tax scheme, the federal government is unfettered by the jurisdictional concerns imposed on state tax systems by constitutional considerations. As a result, federal law is not concerned with the classification of gain as business income and nonbusiness income. Under the state tax scheme, however, a substantial nexus with a taxing state must exist before a state tax may be imposed under well-established Commerce Clause jurisprudence. *Quill Corp. v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). The Due Process and Commerce Clause do not allow a state to tax income arising out of interstate activities unless there is a " 'minimal connection' or 'nexus' between the interstate activities and the taxing

---

The third case relied upon by Canteen, *Hoechst,* involved the classification of income generated from the restructuring of an employee pension plan. The receipt of excess pension assets by the company had produced income. *Id.* The taxpayer reinvested part of the proceeds to fund new retirement plans for its employees and retained the surplus funds for general business purposes. *Id.* The California Supreme Court held that the income was business income apportionable to the state because it was used in furtherance of taxpayer's continuing business operations. *Id.*

Unlike the case before us, both *Kemppel* and *May Department Stores* involved actual liquidations, not deemed liquidations, and their holdings appear to be in accord with Pennsylvania case law. Canteen's attempt to distinguish this case from *Hoechst* by suggesting that Canteen had terminated its business operations in complete liquidation, while the taxpayer in *Hoechst* continued to operate, is directly contrary to the stipulation that none of Canteen's assets were disposed of at any time before or after the transaction, other than in the normal course of business. Stipulation of Facts, ¶ 18. We, therefore, do not find these cases to be instructive or persuasive in addressing the issue at bar.

8.  We note that there has been no challenge as to the constitutionality of this regulation.

9.  While Canteen contends that this regulation was promulgated before the IRC's adoption of Section 338(h)(10) and therefore only applies to "straight" Section 338 elections and not to elections made under Section 338(h)(10), we can find no support for such an interpretation.

State, and a 'rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Exxon Corporation v. Wisconsin Department of Revenue,* 447 U.S. 207, 212, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (quoting *Mobil Oil Corp. v. Commissioner of Taxes of Vermont,* 445 U.S. 425, 436–437, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980)). Provided there is a sufficient nexus between the taxing state and the corporation, the state may tax the income of the business, by use of apportionment and allocation formulas. *Id.* For Pennsylvania tax purposes, the classification of gain as business income or nonbusiness income is significant as it relates to Pennsylvania's ability to apportion or allocate income to the state.

In the case before us, Canteen was not involved in the sale and was not involved in the Section 338 election made by the parties, but was included on the consolidated return filed with the federal government. Pursuant to Pennsylvania law,[10] Canteen submitted a separate company report with the Department of Revenue. Included in this report were certain gains resulting from the Section 338(h)(10) election made by the buyer and seller of the shares of Vending, Canteen's parent company, for federal tax purposes.

Under the functional test, Canteen's gain from the transaction constitutes business income. The acquisition and management of Canteen's assets as well as the "disposition" of those assets for Section 338 purposes constitute integral parts of Canteen's business. Those assets were and are used to generate business income.

The nature of this transaction did not result in the cessation of Canteen's business. Furthermore, it appears that Canteen's gain from the transaction was used in the continuation of its business operations, which never ceased.

■ Although Canteen is deemed to have distributed all of its assets in complete liquidation based upon the election made under Section 338, such a deemed sale of assets does not constitute a liquidation within the meaning of *Laurel Pipe Line* for Pennsylvania tax purposes. The fiction of the sale of assets for federal tax purposes under Section 338(h)(10) has no bearing for purposes of Pennsylvania taxation. Pennsylvania is not precluded from examining the reality of the situation. The reality of the transaction was not a liquidation of assets, but the sale of stock. There has been no actual sale of Canteen's separate company assets and no cessation of Canteen's separate company business operations. On the day of and on the day after the sale, Canteen had the same assets, its stock was still owned in full by the same parent company, Vending.

Canteen contends that but for the election, the transaction would be treated as a sale of the parent corporation's stock that did not involve Canteen at all and could not possibly have resulted in income for Canteen. This argument completely ignores the fact that Canteen incurred a gain as a result of the sale of its parent corporation's stock in the transaction. The fact that Holdings and Compass jointly filed an election with the IRS to have

---

**10.** The election of Section 338(h)(10) for federal tax purposes requires the parent company and the buyer to file a consolidated return. Pennsylvania, however, does not permit the filing of a consolidated return for corporate net income tax purposes. Section 404 of the Tax Code. If a corporation was a participant in a consolidated return with the federal gov-

ernment, then its taxable income for corporate net income tax purposes would be that which would have been returned to and ascertained by the federal government if the corporation filed a separate return with the federal government. Section 401(3) of the Tax Code.

the sale of Vending stock treated as a sale of assets for federal tax purposes pursuant to Section 338(h)(10) in no way detracts from the fact that Canteen incurred a gain as a result of the transaction.

We, therefore, conclude that the Board of Finance and Revenue did not err in its determination that the income Canteen derived as a result of the stock sale of its parent company constituted business income apportionable to Pennsylvania. Any other result would deprive Pennsylvania of taxes to which it is legitimately entitled.

Accordingly, the order of the Board of Finance and Revenue is affirmed.

Judge SMITH–RIBNER dissents.

### ORDER

AND NOW, this *8th* day of *February,* 2002, the order of the Board of Finance and Revenue, dated November 18, 1997, at BF&R Docket No. 9706627, is hereby affirmed. This order shall become final unless exceptions are filed within thirty (30) days of the date of this order pursuant to Rule 1571(i) of the Rules of Appellate Procedure.[11]

---

11. Rule 1571 provides:

Any party may file exceptions to an initial determination by the trial court under this rule within 30 days after the entry of the order to which exception is taken. Such timely exceptions shall have the effect, for the purposes of Rule 1701(b)(3) (authority of lower court or agency after appeal) of an order expressly granting reconsideration of the determination previously entered by the court. Issues not raised on exceptions are waived and cannot be raised on appeal.