## GLATFELTER PULPWOOD COMPANY, Petitioner

### v.

## COMMONWEALTH of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 6, 2011.

Decided May 4, 2011.

---

George T. Bell, Harrisburg, for petitioner.

Jonathan C. Edmunds, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge PELLEGRINI.

Glatfelter Pulpwood Company (Taxpayer) petitions for review from an order of the Board of Finance and Revenue (Board) denying its request for a tax refund because its timberland sales gains meets the definition of "business income" under Section 401(3)2.(a)(1)(A) of the Tax Reform Code of 1971.[1] For the reasons that follow, we affirm the Board's decision.

## I.

According to the parties' Stipulation of Facts, Taxpayer is a wholly-owned subsidiary of P.H. Glatfelter Corporation, the parent company (Parent), which is a corporation that is organized under the laws of Maryland and maintains its headquarters in York, Pennsylvania. The Parent is engaged in the business of manufacturing specialty papers and engineered products

---

1. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7401(3)2.(a)(1)(A).

and has timberlands located in Delaware, Maryland, Pennsylvania and Virginia. Taxpayer's sole business activity is the procurement of pulpwood either from harvesting company-owned timberland or by purchasing timberland from third parties for the specialty paper manufacturing operations of the Parent. Taxpayer operates the Parent's paper mill in Spring Grove, Pennsylvania.

Prior to 2003, Taxpayer obtained approximately 25% of the pulpwood needed for its Parent's paper manufacturing operations from company-owned timberland and procured approximately 75% of the needed pulpwood from purchases on the open market. In 2003, following an industry trend, Taxpayer made a corporate decision to divest certain of its timberland holdings with the effect of reducing the percentage of pulpwood procured from company-owned timberland from approximately 25% to approximately 5%. This was known as the "Timberland Divestiture Plan." As a result, Taxpayer sold 5,000 acres of timberland in Delaware and 25,-821 acres of timberland in Maryland. It sold most of its timberland in Maryland to The Conservation Fund, a non-profit Maryland corporation, and received in consideration a 10–year note in the amount of $37.9 million. It also entered into a supply agreement to purchase at market prices an annual amount of pulpwood averaging 34,-425 tons per annum over the eight-year term of the agreement on the timberlands sold to The Conservation Fund. As of December 31, 2004, Taxpayer owned 14,364 acres of timberland in Delaware; 25,587 acres of timberland in Pennsylvania; 40,-676 acres of timberland in Virginia; and 49 acres of timberland in Maryland.

During 2004, as part of the Timberland Divestiture Plan, Taxpayer sold 4,882 acres of timberland in Delaware for $56,586,000, realizing a net gain of $55,355,452 ("the 2004 Delaware Sale"). Taxpayer reported the 2004 Delaware Sale on its federal tax return as a sale or exchange of property used in a trade or business. The income generated by the sales of pulpwood from the business prior to the 2004 sale was reported to Pennsylvania as apportionable business income. Taxpayer distributed all of the net proceeds from the 2004 Delaware Sale to its Parent, which, in turn, used the proceeds to pay debt and pay dividends to its shareholders.

Taxpayer filed its 2004 corporate tax report omitting any inclusion of nonbusiness income and reporting a tax liability of $2,189,876. Taxpayer paid this liability and filed an amended corporate tax report claiming that the net gain from the 2004 company-owned timberland in Delaware was nonbusiness income to be allocated to Delaware. The amended corporate tax report reported a zero corporate net income tax liability. On settlement of Taxpayer's 2004 tax year, the Department of Revenue (Department) increased the apportionable business income from a ($3,044,914) net loss to $52,327,343 through denial of the nonbusiness income treatment of the net gain related to the 2004 timberland sale. As a result, the Department asserted additional corporate net income tax liability owed by Taxpayer in the amount of $2,205,211.

Taxpayer filed an appeal with the Board of Appeals seeking a refund of the 2004 corporate net income tax in the amount of $2,205,211 based on a claim of nonbusiness income treatment for the net gain from the 2004 Delaware Sale. The Board of Appeals refused Taxpayer's refund claim, and Taxpayer appealed to the Board again requesting nonbusiness income treatment for the net gain from the 2004 Delaware Sale. The Board denied Taxpayer's request because it found that

the timberland sales gains met the definition of "business income" under Section 401(3)2.(a)(1)(A) of the Tax Reform Code of 1971 and met the transactional test for business income:

> because buying and selling timberland occurred in the regular course of [Taxpayer's] business. *Welded Tube Co.*,[2] *supra.* [Taxpayer] decided that it under utilized its timberlands and engaged in a series of timberland sales in 2003 and in 2004. The timberland sales gains meet the functional test for business income because the acquisition and management of timberlands constituted an integral part of [Taxpayer's] regular trade or business. 72 P.S. § 7401(3)2.(a)(1)(A). All business income is apportioned under the Tax Reform Code. 72 P.S. § 7401(3)2.(a)(9)(A). The Department correctly settled and apportioned [Taxpayer's] business income.

(Board's May 22, 2007 decision at 7.) This appeal by Taxpayer followed.[3]

## II.

■ For purposes of corporate net income tax, Pennsylvania classifies income into two groups: business income and non-business income. "Business income" is defined as:

> Income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if *either* the acquisition, the management *or* the disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations. The term includes all income which is apportionable under the Constitution of the United States.[4] (Emphasis added.)

Income that is "apportionable" means that it is divided among states with some nexus to the business based on a formula. In Pennsylvania, the apportionment is based on payroll, property and sales. 72 P.S. § 7401(3)2.(a)(9)(A).

In *Welded Tube Company*, this Court set forth two alternative independent tests by which to evaluate whether income was properly classified as business income or nonbusiness income.[5] We stated that the "transactional" test was utilized for the first clause of the definition: gains were classified as business income when they were derived from a transaction in which

2. *Welded Tube Company of America v. Commonwealth*, 101 Pa.Cmwlth. 32, 515 A.2d 988 (1986).

3. In appeals from decisions of the Board of Finance and Revenue, our review is *de novo* because we function as a trial court even though such cases are heard in our appellate jurisdiction. *Canteen Corporation v. Commonwealth*, 818 A.2d 594 (Pa.Cmwlth.2003).

4. "Nonbusiness income" is defined as "all income other than business income. The term does not include income which is apportionable under the Constitution of the United States." 72 P.S. § 7401(3)2.(a)(1)(D).

5. In *Welded Tube Company*, "business income" was defined as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and in-

cludes income from tangible and intangible property *if* the acquisition, management, *and* disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." 72 P.S. § 7401(3)2.(a)(9). The definition was amended by Section 25 of the Act of June 22, 2001, P.L. 353, to include the word "either" after "tangible and intangible property if" and the word "or" instead of the word "and" between the words "management" and "disposition of the property." The second sentence was also added. Subsequently, in Section 5 of Act 23, Act of June 22, 2001, P.L. 353, No. 23, the General Assembly stated that it "finds and declares that the intent of the amendment of section 401(3)2(a)(1)(A) and (D) of the act is to clarify existing law."

the taxpayer regularly engaged, i.e., the test measured the frequency and regularity of similar transactions and past practices of the business. Also, the taxpayer's subsequent use of the income was relevant in determining whether the income was business income. Looking at the second clause of the definition of "business income," the "functional" test was utilized: "in the view of other jurisdictions, by which earnings may be characterized as business income: income from 'tangible and intangible property if the acquisition, management and disposition of the property constitute *integral parts* of the taxpayer's regular trade or business.' Under this test, the gain arising from the sale of an asset will be classified as business income if the asset produced business income while it was owned by the taxpayer." *Welded Tube Company*, 515 A.2d at 994. (Emphasis in original.) The extraordinary nature or infrequency of the transaction was irrelevant.

### A.

Taxpayer contends that the sale of the timberland does not meet the transactional test because it does not regularly deal in the business of selling or speculating in real estate. Its regular and routine business is the procurement and sale of harvested pulpwood to its Parent. It points out that from 1970 through 2002, it made only incidental sales of timberlands, primarily in isolated transactions to "round off" tracts or to accommodate a neighboring landowner. Those sales amounted to a miniscule 0.21% of Taxpayer's timberland holdings per year. Therefore, while the routine sale of timber would be deemed business income, the 2004 Delaware Sale was not a transaction or activity in which Taxpayer "regularly" engaged and it should not be deemed apportionable business income under the transactional test. We agree and the Commonwealth does not

contend otherwise that the 2004 Delaware Sale does not fall under the transactional test because it was a one-time event and cannot possibly meet the definition of regular and routine business.

### B.

Taxpayer also argues that it does not fall under the functional test because to do so, the property itself would have to be an integral part of its regular trade or business. In this case, while the timber is integral to its regular business operations, the real estate itself is not. It argues, by example, that if it were to sell the Parent's corporate headquarters, that could conceivably fall within the functional test if the building was deemed an integral part of Taxpayer's trade or business. However, because the 2004 Delaware Sale is not an integral part of Taxpayer's regular trade or business, the gain on the transaction is not business income under the functional test either.

In order to fall under the functional test, "business income" is included if it comes from the management, acquisition or disposition of property which constitutes an integral part of Taxpayer's regular trade or business. In addition, "under this test, the gain arising from the sale of an asset will be classified as business income if the asset produced business income while it was owned by the taxpayer. The extraordinary nature or infrequency of the transaction is irrelevant." *Welded Tube*, 515 A.2d at 994. The stipulated facts indicate that Taxpayer had employees and/or third party contractors plant, thin and harvest timber and monitor soil conditions to maximize sustainable pulpwood yields as part of its ongoing timberland management practices. In 2003, as part of the strategic decision by its Parent to reduce the purchase of timber from pulp

from 25% to 5% of its needs, Taxpayer began to dispose of timberland, including the sale of approximately 5,000 acres of timberland in Delaware for $56,586,000. As the stipulated facts show, Taxpayer's sales were part of "the management *or* the disposition of the property constitut[ing] an integral part of the taxpayer's regular trade or business operations management," 72 P.S. § 7401(3)2.(a)(1)(A), making the income derived from the sale of business income.

## C.

Now to the Taxpayer's major contention regarding whether the disposition of assets constitutes business income. Relying on *Laurel Pipe Line Company v. Board of Finance and Revenue*, 537 Pa. 205, 642 A.2d 472 (1994), Taxpayer argues that the sale of the Delaware timberland was not a routine occurrence in Taxpayer's regular business operation because it constituted a partial liquidation of a unique aspect of its business assets, and the net gain should be deemed nonbusiness income allocable to Delaware where the real property was situated.

In *Laurel Pipe Line,* Laurel was an Ohio corporation in the business of transporting petroleum products from refinery and pipeline connections from Philadelphia to Pittsburgh. It also operated a pipeline from Aliquippa, Pennsylvania to Cleveland, Ohio from 1983 until 1986. It discontinued the operation of that Pennsylvania–Ohio pipeline in 1983 and sold the pipeline for a gain of almost $4 million. When it filed its 1986 Pennsylvania corporate net income tax return, Laurel treated the gain from the sale of the pipeline as nonbusiness income and allocated the gain between Pennsylvania and Ohio. Because the Pennsylvania Department of Revenue reclassi-

fied the gain as business income subject to apportionment, Laurel filed a petition for resettlement with the Board of Appeals, which was denied. On appeal, the Supreme Court adopted the *Welded Tube* functional test and stated that the then statutory definition of business income required that "the acquisition, management, *and disposition* of the property constitute integral parts of the taxpayer's *regular* trade or business operations." 72 P.S. § 7401(3)2.(a)(1)(A). (Emphasis in original.) The Court determined that the entire pipeline was not being disposed of, but the sale of the pipeline was a liquidation of a separate and distinct aspect of its business stating:

> [T]he pipeline was not disposed of as an integral part of Laurel's regular trade or business. Rather, the effect of the sale was that the company liquidated a portion of its assets. This is evidenced by the fact that the proceeds of the sale were not reinvested back into the operations of the business, but were distributed entirely to the stockholders of the corporation.

537 Pa. at 211, 642 A.2d at 475. In doing so, our Supreme Court made applicable that portion of the transactional test that "the gain accruing from the sale of assets pursuant to business liquidation has been held under this [transactional] test to be nonbusiness income arising from a transaction of an extraordinary nature outside the regular course of the taxpayer's trade or business" to the functional test. *Welded Tube*, 515 A.2d at 993. The Court held that the gain was nonbusiness income because the pipeline constituted a partial liquidation of the company's business because it had changed the structure of the taxpayer's business and that was not a transaction in which the company regularly engaged.[6]

6. The Commonwealth, however, argues that

since *Laurel Pipe Line,* 72 P.S.

However, the facts in *Laurel Pipe Line* are different from the facts of this case. First, the proceeds of the sale in *Laurel* were distributed directly back to its Parent, what a subsidiary does who no longer needs the money for ongoing business activities. Second, *Laurel* disposed of pipeline that ended its business in a certain area indicating a partial liquidation of its business. Here, however, the 2004 Delaware Sale was not a liquidation of its business because Taxpayer still owns 14,364 acres of timberland in Delaware, and the sale took place because its Parent decreased the percentage of the pulp it procured from Taxpayer. Its ongoing business still continued. Third, unlike in *Laurel*, the sale did not change the scope of Taxpayer's business because where the timber that produced pulp came from, i.e., which state, was irrelevant because Taxpayer operated as an integrated business enterprise. Finally, Taxpayer, before and after the disposition of this property, was going to continue to sell pulp to its Parent as part of its ongoing business activities. All of that indicates that Taxpayer, while disposing of its holdings, was not engaged in liquidating its business or parts of its business.[7]

---

§ 7401(3)2.(a)(1)(A), was amended by Act 23 of 2001 by the addition of the word "either" after "tangible and intangible property if" and, more pertinently, the word "or" instead of the word "and" between the words "management" and "disposition of the property," those additions change the outcome in *Laurel Pipe Line* to the effect that the sale of an asset producing business income during the ownership could produce nonbusiness income by its sale. Taxpayer argues that change does not change the status of the law, including *Laurel Pipe Line*, because in Section 5 of Act 23, Act of June 22, 2001, P.L. 353, No. 23, the General Assembly stated that it "finds and declares that the intent of the amendment of section 401(3)2(a)(1)(A) and (D) of the act is to clarify existing law." Because of the way we have resolved this matter, we need not address this issue but we note that this Court in *Canteen Corporation* held that the statutory change in Act 23 regarding the definitions of "business income" and "nonbusiness income" was an amendment, *Canteen Corporation*, 818 A.2d at 598 ns.9–10, and any attempt by the General Assembly to interpret the Tax Reform Code is beyond its powers, *Mack Trucks, Inc. v. Commonwealth*, 157 Pa.Cmwlth. 14, 629 A.2d 179 (1993).

7. Taxpayer also relies on *Canteen Corporation* for the same proposition. In that case, the issue was whether a corporate taxpayer's gain from the fictional liquidation of assets deemed to occur under a federal tax election was taxable by the Commonwealth. Canteen was incorporated in Delaware, headquartered in North Carolina and conducted its food service business operations in many states, including Pennsylvania. It was a wholly-owned subsidiary of I.M. Vending, which was a wholly-owned subsidiary of Canteen Holdings, Inc. Holdings was a subsidiary of Flagstar Companies, Inc. In 1994, as part of Flagstar's divestiture plan, Holdings sold Vending to Compass Holdings, Inc., an unrelated corporation, and Canteen, as a subsidiary of Vending, was conveyed to Compass as an asset. It did not participate as a party to the sale or receive cash or other proceeds as a result of the sale. After the sale, Holdings and Compass chose to apply a certain section of the Internal Revenue Code so that the sale of Vending stock was treated as if Vending sold all of its assets in liquidation and distributed the proceeds to its parent, Holdings. Canteen, the subsidiary of Vending, was also deemed to have sold all of its assets in liquidation and to have distributed the proceeds to Vending. Under the Internal Revenue Code, Canteen realized a fictitious gain for both state and federal income tax purposes. This Court held that the gain had to be treated as nonbusiness income because the asset liquidation did not generate business income under the transactional test. It also was not a type of transaction in which Canteen regularly engaged. Further, the proceeds had been distributed to the stockholder. Again, *Canteen Corporation* does not support its argument because Taxpayer regularly engages in the timberland business. Although it distributed proceeds from the 2004 Delaware Sale to its Parent, it did not make the sale for the purposes of liquidation. Moreover, we have determined that the transactional test that was used in *Canteen Corporation* does not apply in this case.

### III.

■ Taxpayer also argues that because its Parent's real estate is located in Delaware and is unrelated to Taxpayer's regular business activities of procuring pulpwood for the Parent, the gain on its sale should be excluded from the taxable base for Pennsylvania corporate net income tax regardless of whether the gain is deemed business or nonbusiness income. It argues that the disposing of unneeded real estate assets in Delaware is not a necessary part of its corporate activity in Pennsylvania of procuring pulpwood of Taxpayer's regular business in Pennsylvania.

In *Commonwealth v. ACF Industries, Incorporated*, 441 Pa. 129, 271 A.2d 273 (1970), our Supreme Court set forth the following principles to follow to decide if apportionment was allowed:

First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this State, the factors attributable to the outside activity may be excluded. Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this context. Third, without attempting to preclude exclusion in any given case, we reiterate our statement above that the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division and partial exclusion. On the other hand, a truly divisionalized business, conducting disparate activities with each division internally integrated with respect to manufacturing and selling, may well be in a position to make a valid claim for exclusion.

441 Pa. at 142, 143, 271 A.2d at 279, 280.

In effect, Taxpayer's argument that its Parent's 2004 Delaware Sale is unrelated to Pennsylvania is a variation on its theme that it does not meet the functional test. Based on the Stipulations of Facts, we found that the company operated as a unitary whole; the activities in procuring pulpwood were integrated, involving pulp from timberland from a number of states to provide pulp for a paper mill in Pennsylvania; and the Delaware sale was not a liquidation but the disposition of property that was used in producing business income. For those reasons, the income from the 2004 Delaware Sale is subject to tax in Pennsylvania as business income.

### IV.

Finally, Taxpayer argues that it is being unfairly taxed on the sale of a parcel of timberland situated in Delaware in violation of the Due Process and Commerce Clauses of the United States Constitution. Taxpayer argues that the issue under both of those clauses is that the method of apportionment employed by Pennsylvania is unfair.

■ Regarding the Commerce Clause, Taxpayer contends that the tax does not comply with the United States Supreme Court test to determine whether a state tax violated the Commerce Clause in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under that test, a state tax is held to be constitutionally valid if the tax (1) is applied to an activity having a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate

against interstate commerce, and (4) is fairly related to the services provided by the state. Taxpayer argues that the imposition of the tax does not meet the second and fourth prongs of the test because it is not fairly apportioned and is not fairly related to the services provided by the state. As for the Due Process Clause claim, Taxpayer argues "the income attributed to the State for tax purposes must be rationally related to values connected with the taxing state." *Quill Corp. v. North Dakota*, 504 U.S. 298, 306, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (citation and internal quotation marks omitted).

■ As to whether the tax is apportioned fairly, Taxpayer contends that because Delaware has already taxed Taxpayer 100% of the income on the gain attributable to the sale of real property and Pennsylvania another 42%, that means that those states apply their taxes against 142% of the income in those two states alone, not even considering the possibility of taxation in other states such as Maryland and Virginia. However, whether there has been a fair apportionment is determined by whether the apportionment formula (1) "if applied in every jurisdiction, … would result in no more than all the unitary business income test being taxed" if every state had assessed an identical tax statute and (2) "the factor or factors [here property, payroll and sales] used in the apportionment formal … actually reflect how the income is being generated." *Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). In this case, if every jurisdiction applied the factors used here, which are not challenged, then no more than 100% of the unitary income would be taxed.

■ Taxpayer argues that the tax is not fairly related to the services provided by the state because except for the gain from the 2004 Delaware Sale, Taxpayer reported to Pennsylvania a net loss of $3 million. The Department attempts to attribute to the Commonwealth a substantial portion— 42%—of the $52.3 million net gain in Delaware by including the amount in apportionable income. Taxpayer contends that the methodology being employed taxes an unreasonable amount of Taxpayer's income not attributable to its Pennsylvania activities and creates an unreasonable and unfair tax burden under the Due Process Clause. However, assuming that test even applies, given that the Commonwealth is home to Taxpayer and its Parent, Taxpayer has timberland in Pennsylvania and uses the Pennsylvania infrastructure to deliver the pulpwood to Pennsylvania; it does not just have some tangential relationship to the state that would establish that the tax is not fairly related to the services it receives from Pennsylvania.

■ In conclusion, under the Due Process Clause, there must be some definite link, some minimal connection, between a state and the person, property or transaction it seeks to tax as well as a rational relationship between the tax and the values connected with the taxing state. *Quill Corporation*. The Commerce Clause limitation forbids states to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. *Id*. The misunderstanding by Taxpayer is that there is no violation by Pennsylvania of either the Due Process or Commerce Clauses because, while Delaware may tax whatever portion it sees fit on the gain from the 2004 Delaware Sale, so may the Commonwealth without regard for whatever amount Delaware taxed Taxpayer for that sale. The Commonwealth need only consider what activities Taxpayer conducts in Pennsylvania that have some connection

to its activities in Delaware. Because we have already determined that the 2004 Delaware Sale had a relationship to the business activities in Pennsylvania and was properly apportioned for taxes in Pennsylvania, there was no violation of the Due Process or Commerce Clauses.

Accordingly, for the foregoing reasons, the order of the Board is affirmed.

Judges McGINLEY, SIMPSON and LEAVITT dissent.

**ORDER**

AND NOW, this 4th day of May, 2011, the order of the Board of Finance and Revenue, dated May 22, 2007, is affirmed. The parties have 30 days from the entry of this order in which to file exceptions.