61 A.3d 993

**GLATFELTER PULPWOOD COMPANY, Appellant**

v.

**COMMONWEALTH of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued May 8, 2012.

Decided Jan. 22, 2013.

244

George Timothy Bell, Esq., Morgan Lewis & Bockius, L.L.P., for Glatfelter Pulpwood Company.

John Bartley Delone, Linda L. Kelly, Jonathan Charles Edmunds, PA Office of Attorney General, Calvin Royer Koons, Clinton G. Smith, Jr., for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

In this direct appeal, Glatfelter Pulpwood Company ("Appellant") challenges the Commonwealth Court's affirmance of the Board of Finance and Revenue's determination that Appellant's gains from the sale of a tract of Delaware timberland be characterized as "business income," subject to taxation in Pennsylvania. Upon review, we affirm the order of the Commonwealth Court.

The parties have stipulated to the relevant facts in this case, which we summarize as follows. *See* Stipulation of Facts, dated 10/01/10 (hereinafter "Stipulations"). Appellant, a corporation organized under Maryland law, with headquarters in Spring Grove, Pennsylvania, is a wholly-owned subsidiary of P.H. Glatfelter Corporation ("Parent"). Parent, a Pennsylva-

nia corporation, the headquarters of which are in York, Pennsylvania, owns and operates a paper mill in Spring Grove, Pennsylvania, where it produces a variety of specialty paper products. Appellant's sole business activity is to procure pulpwood[1] for Parent's operations, at the lowest possible cost, from two sources, i.e., by growing trees on and harvesting trees from Appellant's own timberland, or by purchasing pulpwood from third parties on the open market. As of January 1, 2003, Appellant's timberland holdings were as follows: 25,821 acres in Maryland; 19,249 acres in Delaware; 28,595 acres in Pennsylvania; and 40,682 acres in Virginia. As part of its ongoing management practices for these timberlands, Appellant hires employees and independent contractors to plant, thin, and harvest timber and to monitor soil and water quality in order to maximize sustainable pulpwood yields. Except for isolated and unpredictable transactions, Appellant sells to Parent all the pulpwood procured, for use at Parent's Pennsylvania paper mill. Appellant reports all income generated by its pulpwood sales to Parent in Pennsylvania as apportionable business income.

In 2003, Appellant made a strategic corporate decision to sell certain of its timberland holdings, thereby decreasing the percentage of pulpwood procured for Parent from Appellant's timberlands. In 2004, as part of its timberland divestiture plan, Appellant sold 4,882 of its 19,249 Delaware acres for $56,586,000, realizing a net gain of $55,355,452. Appellant distributed all of the net proceeds from this sale to Parent, which used the distributed proceeds to pay down debt and to pay dividends to its shareholders.

As required by Delaware tax law, Appellant allocated 100% of the net gain from the Delaware timberland sale to Delaware, and paid Delaware corporate income tax on the gain in 2004.[2] Appellant reported the timberland sale on its federal tax return as a sale or exchange of property used in a trade or

1. Pulpwood is made from small-diameter, low-quality trees that have been chipped. Stipulations at ¶ 6.

2. Appellant's 2004 Delaware corporate income tax on the gain from the timberland sale was $4,551,177. Stipulations at ¶ 30.

business. In its initial 2004 Pennsylvania corporate tax report, Appellant reported a corporate net income tax liability of $2,189,876, which it paid. Subsequently, Appellant filed an amended 2004 Pennsylvania corporate tax report asserting that its reported net gain on the 2004 Delaware timberland sale should have been considered as non-business income allocated to Delaware. Therefore, Appellant claimed, it actually suffered a net loss of $3,044,914 for the tax year, and its Pennsylvania corporate net income tax liability was zero. On settlement of the 2004 tax year, the Pennsylvania Department of Revenue (hereinafter "Department") declined to characterize Appellant's net gain from the Delaware timberland sale as non-business income, and concluded that Appellant's 2004 business income was $52,327,343. The Department attributed 42% of Appellant's income to Pennsylvania and, accordingly, assessed Appellant's corporate net income tax liability at $2,205,211.[3] *See Stipulations at ¶¶ 30–34; Glatfelter Pulpwood Company v. Commonwealth of Pennsylvania,* 19 A.3d 572, 575, 581 (Pa.Cmwlth.2011) (*en banc* ).

Appellant filed an appeal with the Department's Board of Appeals, seeking a refund of its 2004 corporate net income tax in the amount of $2,205,211, based on its assertion that the gain from the sale of the timberland constituted non-business income. The Board of Appeals denied relief. Appellant then filed an appeal with the Board of Finance and Revenue (hereinafter "BF & R"), again requesting that the gain from the timberland sale be considered as non-business income. The BF & R denied the appeal, concluding, *inter alia,* that "the timberland sale[']s gains meet the functional test for business income because the acquisition and management of timberlands constituted an integral part of [Appellant's] regular trade or business," and the "Department correctly settled and apportioned [Appellant's] business income." Decision of BF & R, dated 5/22/07 at 7 (citing 72 P.S. § 7401(3)2.(a)(1)(A)). On June 21, 2007, Appellant filed a timely petition for review

3. Upon resettlement dated June 29, 2007, the Department revised its determination of Appellant's total tax liability to $2,190,579. *See* Corporation Taxes Resettlement, dated 6/29/07; Commonwealth's Brief at 9 n. 3.

in the Commonwealth Court seeking review of BF & R's decision.

The Commonwealth Court affirmed the decision of the BF & R in a published opinion. *Glatfelter Pulpwood, supra* at 572. Appellant then filed a direct appeal with this Court, presenting the following three issues:

 a. Whether for Corporate Net Income Tax purposes the net gain realized from the sale and liquidation of the Taxpayer's timberlands situated in Delaware pursuant to an adopted Timberland Divestiture Plan constitutes "non[-]business income" to be allocated to Delaware, rather than apportioned to Pennsylvania, when in this instance the net income from the sale was distributed to the Taxpayer's shareholder and not used in the Taxpayer's regular business operations or activities?

 b. Whether for Corporate Net Income Tax purposes the sale of the Taxpayer's timberlands located in Delaware is unrelated to its regular business operations carried on in Pennsylvania during the tax year which consisted of selling pulpwood to its parent?

 c. Whether the taxation by the Commonwealth of 42% of the net gain on the sale of Taxpayer's timberlands situated in Delaware and taxed 100% by Delaware is unfair and unreasonable in violation of the Due Process and Commerce Clauses of the U.S. Constitution?

Appellant's Brief at 3.

 The issues presented are questions of law; accordingly, our standard of review is *de novo* and our scope is plenary. *Safe Harbor Water Power Corporation v. Fajt,* 583 Pa. 234, 876 A.2d 954, 966 n. 12 (2005).

 "Pennsylvania's corporate income tax is an excise tax on the privilege of earning income and, therefore, under the Commerce Clause of the United States Constitution, Pennsylvania may subject to taxation only that part of corporate income reasonably related to the privilege exercised in this Commonwealth." *Canteen Corp. v. Commonwealth of Pennsylvania,* 818 A.2d 594, 597–98 (Pa.Cmwlth.2003) (*en banc* ),

*aff'd,* 578 Pa. 504, 854 A.2d 440 (2004) (*per curiam*). The general procedure for calculating Pennsylvania's corporate income tax is set forth in the Tax Reform Code of 1971,[4] which, as a first step, classifies income as "business income" or "non-business income." The statutory definition of these terms will be discussed in the next paragraph, but initially it is important to recognize the substantial tax consequences of this classification. To calculate the tax on business income of a multistate corporation, the Commonwealth employs a formula based on the ratio of three factors, to wit, the corporation's payroll, property, and sales within Pennsylvania, to the corporation's total payroll, property, and sales, respectively. 72 P.S. § 7401(3)2.(a)(9), (10), (13), (15); *Commonwealth of Pennsylvania v. Gilmour Manufacturing Company,* 573 Pa. 143, 822 A.2d 676, 677 (2003). In contrast, "non[-]business income is allocated to the situs of the income producing property." *Laurel Pipe Line Co. v. Commonwealth of Pennsylvania, Board of Finance and Revenue,* 537 Pa. 205, 642 A.2d 472, 474 (1994); *see* 72 P.S. § 7401(3)2.(a)(4).

Business income is statutorily defined as

income arising from transactions and activity in the regular course of the taxpayer's trade or business and **includes income from tangible and intangible property if either the acquisition, the management or the disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations.** The term includes all income which is apportionable under the Constitution of the United States.

72 P.S. § 7401(3)2.(a)(1)(A) (emphasis added).

The above statutory definition of business income was enacted in 2001. Prior to that time, the definition of business income read as follows:

income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if **the acquisi-**

4. Act of March 4, 1971, P.L. 6, No. 2, as amended, 72 P.S. §§ 7101–8297.

tion, **management,** *and* **disposition** of the property constitute integral parts of the taxpayer's regular trade or business operations.

72 P.S. § 7401(3)2.(a)(1)(A), repealed and revised in 2001 (emphasis added).

Non-business income is statutorily defined as

all income other than business income. The term does not include income which is apportionable under the Constitution of the United States.

72 P.S. § 7401(3)2.(a)(1)(D).

In sum, the 2001 amendments modified the definitions of business income and non-business income as follows. Most relevantly to the instant case, the 2001 amendments changed the conjunction connecting "acquisition, management, disposition" in the definition of business income from "and" to "or." The 2001 amendments changed the definition of non-business income only by adding the second sentence. Finally, the General Assembly declared that the intent of the 2001 amendments to the statutory definitions of business income and non-business income was to "clarify existing law." 72 P.S. § 7401, Historical and Statutory Notes (quoting Act 2001–23 § 25).

To determine whether income is properly categorized as business or nonbusiness income, this Court has adopted two alternative and independent tests: the transactional test and the functional test. *Ross–Araco Corp. v. Commonwealth of Pennsylvania, Board of Finance and Revenue,* 544 Pa. 74, 674 A.2d 691, 694 (1996) ("In [*Laurel Pipe Line Co.,* 642 A.2d at 474], we adopted the transactional and functional tests used by the Commonwealth Court in [*Welded Tube Company of America v. Commonwealth of Pennsylvania,* 101 Pa.Cmwlth. 32, 515 A.2d 988 (1986) ].").

The transactional test is based on the first clause of the statutory definition of business income, *i.e.,* "income arising from transactions and activity in the regular course of the taxpayer's trade or business." Under the transactional test, a gain is business income if "the corporation regularly engages in the type of transaction that produced the gain." *Canteen*

*Corp., supra* at 598. "The transactional test measures the particular transaction against the frequency and regularity of similar transactions in the past practices of the business. The taxpayer's subsequent use of the income is also relevant in determining whether gain is business income." *Ross–Araco, supra* at 693.

■■■ The functional test is based on the second clause of the statutory definition of business income, *i.e.,* "income from tangible and intangible property if either the acquisition, the management or the disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations." Under the functional test, a gain from the sale of an asset is business income if the corporation acquired, managed, or disposed of the asset as an integral part of its regular business. In addition in *Ross–Araco, supra* at 693, we stated that a gain was business income if the gain arose from the sale of an asset that produced business income while it was owned by the taxpayer. "The extraordinary nature or infrequency of the transaction is irrelevant for purposes of the functional test." *Id.*[5]

5. The dissent appears to suggest that the continued viability of the functional test should be re-examined in light of the 2001 amendment to the statutory definition of business income on which the test is based. Dissenting Opinion at 278, 61 A.3d at 1014 (Eakin, J.) ("Where a test is an interpretation of a clause that is subsequently changed, it is the test itself that is in question.").

We cannot agree that the General Assembly, by amending the definition of business income, intended to call into question the continued viability of the functional test. This Court adopted the transactional and the functional tests in 1994, six years before the General Assembly amended the definition of business income. *See* text, *supra.* The General Assembly was thus surely aware of this Court's adoption of two separate tests based on distinct clauses composing the definition of business income. Nonetheless, the 2001 amendments did not specifically or expressly address either the transactional or the functional test. Rather, the General Assembly stated that it "finds and declares that the intent of the amendment [of the section setting forth the definitions of business income and nonbusiness income] is to clarify existing law." 72 P.S. § 7401, Historical and Statutory Notes (quoting Act 2001-23, § 25). There is no indication whatsoever that the General Assembly, by changing the definition of business income from the conjunctive to the disjunctive, intended to disapprove of this Court's adoption of the functional test.

This Court has applied the transactional and functional tests in two prior cases, both of which were decided before the 2001 amendments to the definitions of business and non-business incomes. *See Ross–Araco, supra,* and *Laurel Pipe Line Co., supra.* In *Ross–Araco,* the issue was whether a corporation's $1,428,499 gain from the sale of a tract of land in New Jersey was business or non-business income. The corporation was in the construction business and did not regularly engage in the purchase or sale of real estate. *Ross–Araco, supra* at 692–93, 696–97. The land at issue was heavily wooded, remained "unimproved" during the corporation's ownership, was not rented, and did not produce any income. *Id.* at 692, 696–97. There was no evidence that the land was directly or indirectly involved in the corporation's investment activities, nor that it produced any investment income prior to the sale. *Id.* at 696. We affirmed the Commonwealth Court in holding that the gain from the sale of the land constituted nonbusiness income, whether assessed by the transactional or functional test. *Id.* at 697.

In *Laurel Pipe Line,* the issue was whether an Ohio corporation's gain on the sale of an idle pipeline and related assets was business or non-business income. The corporation was in the business of transporting petroleum products from the Philadelphia area to Pittsburgh and to Cleveland, Ohio. *Id.* at 473. At some point, the corporation discontinued its operation of a pipeline from Aliquippa, Pennsylvania, to Cleveland, Ohio, and then, three years later, sold the idle pipeline, along with related assets, for a gain of $3,766,047, distributing the entire after-tax net proceeds to stockholders. *Id.* The parties agreed that the gain from the pipeline sale did not satisfy the transactional test, and the question before this Court was whether it satisfied the functional test. *Id.* at 474–75. Reversing the Commonwealth Court, we held that it did not.

In reaching this holding, we cited the pre–2001 definition of business income that was in effect at the time *Laurel Pipe* was decided, to wit, income from property if "the acquisition, management, *and disposition* of the property constitute integral parts of the taxpayer's *regular* trade or business opera-

tions." *Id.* at 475 (quoting 72 P.S. § 7401(3)2.(a)(1)(A)) (emphasis added in original opinion). Tracking the text of this definition, we concluded that "the pipeline was not disposed of as an integral part of Laurel's regular trade or business;" rather, we characterized the pipeline sale as "a liquidation of a separate and distinct aspect of [the corporation's] business," which resulted in a change in the structure and the geographical location of the business. *Id.* at 475–77. Accordingly, we held that the gain on the sale of the pipeline was nonbusiness income.[6] *Id.* at 477.

One additional case, from the Commonwealth Court, is of relevance here. In *Welded Tube Company of America v. Commonwealth of Pennsylvania*, 101 Pa.Cmwlth. 32, 515 A.2d 988 (1986), the issue was whether the gain from the sale of a corporation's Philadelphia manufacturing facility was business

---

**6.** We respectfully disagree with the dissent's view that the conjunctive nature of the definition of business income in effect at the time *Laurel Pipe* was decided was of no significance or importance to the Court's holding in that case. *See* Dissenting Opinion at 276, 61 A.3d at 1014 (Eakin, J.) (*"Laurel [Pipe ]*, however, was not based on the conjunctive nature of that language. Indeed, it was not based on that portion of the definition at all—the court quotes the definition of course, but never mentions the conjunctive framing of the three words. Changing to the disjunctive did absolutely nothing to alter the reasoning of the court, which properly focused on whether the transaction was an integral part of Laurel's regular trade or business.").

Contrary to the dissent's suggestion, the *Laurel Pipe* Court recognized—and indeed gave emphasis to—the conjunctive nature of the definition, as indicated by the following excerpt of the opinion:

The statutory definition of business income requires that 'the acquisition, management, *and disposition* of the property constitute integral parts of the taxpayer's *regular* trade or business operations.' 72 P.S. § 7401(3)2.(a)(1)(A). . . .

. . . In our view, the pipeline was not disposed of as an integral part of Laurel's regular trade or business.

*Laurel Pipe*, 642 A.2d at 475 (**emphasis in original**).

The *Laurel Pipe* Court based its holding on its determination that the disposition of the pipeline at issue did not constitute an integral part of the company's regular trade or business. Having concluded that the disposition of the pipeline did not satisfy the definition of business income, there was no reason for the Court to address the acquisition or management of the pipeline because the conjunctive nature of the statutory language required that all three—the acquisition, management, **and** disposition of the property—constitute integral parts of the taxpayer's regular trade or business.

or non-business income. The Commonwealth Court held that the net gain from the sale was business income whether analyzed under the transactional or functional test. *Id.* at 994. While acknowledging that the principal business of the corporation was manufacturing welded tube, the Commonwealth Court determined that "it was a regular practice of [the corporation] to acquire property in the expansion of its business." *Id.* In addition, the court determined that the manufacturing facility constituted an integral part of the corporation's business operations. *Id.* The court emphasized that there was no evidence that the closing of the Philadelphia facility was in contemplation of a cessation of the corporation's business operations. To the contrary, the sale was stipulated to be part of a "reorganization [of] manufacturing activities," and the proceeds from the sale were used to extinguish existing corporate debt and to expand the corporation's profitable Chicago manufacturing facility. *Id.* Accordingly, the court held that the gain from the sale of the manufacturing facility was business income.

We turn now to the issues raised by Appellant. In its first issue, Appellant asserts that the gain from the Delaware timberland sale was non-business income because the sale constituted a partial liquidation of a unique aspect of Appellant's business, with the net proceeds distributed to Appellant's shareholder/Parent, not reinvested into Appellant's regular business operations. Appellant's Brief at 13, 28, 34. In Appellant's view, the sale of the Delaware timberland was a partial liquidation of that aspect of its business involving the growth, maintenance, and harvest of its own pulpwood. *Id.* at 26–27. Appellant relies on *Laurel Pipe, supra,* to support its general contention that "business income does not include gain from the sale of an asset where the taxpayer liquidates a unique aspect of its business (such as the Timberland Holdings) and the proceeds are not reinvested in the taxpayer's regular business operations." Appellant's Reply Brief at 4; *see also id.* at 3; Appellant's Brief at 23–31, 34–35. Under Appellant's interpretation of *Laurel Pipe,* this Court has "carv[ed] out an exception from business income" for gains

derived from the liquidation of a segment of a taxpayer's business. Appellant's Reply Brief at 4. Appellant suggests that this Court arrived at its holding in *Laurel Pipe* without finding it necessary to parse the statutory language of the definition of business income, and Appellant places little if any importance on the 2001 amendment to the statutory definition of business income. Appellant's Reply Brief at 4.

In addition, Appellant distinguishes the timberlands from the harvested timber, arguing that only the timber itself, and not the land on which it was grown and from which it was harvested, produced business income. Appellant's Brief at 22. While acknowledging that the sales of pulpwood cut from the Delaware timberland had been reported to Pennsylvania as apportionable business income for tax years prior to the sale of the land, Appellant maintains that the "timberlands themselves did not produce business income." *Id.* at 22–23.

Appellee, in response, argues that Appellant's gain from the sale of the timberlands is business income because the timberlands, from their acquisition to their management to their disposition, were wholly integrated into Appellant's business operations and generated business income during the time they were owned by Appellant. Appellee's Brief at 14–16. In addition, Appellee argues that Appellant's reliance on *Laurel Pipe* is misplaced because the definition of business income has been amended in a highly relevant manner since that case was decided. Finally, Appellee argues that *Laurel Pipe* is distinguishable on its facts from the present case because Appellant did not liquidate a portion of its business, but rather continues its business just as before the sale, retaining some timberland holdings, even in Delaware. *Id.* at 17.

The Commonwealth Court held that Appellant's gain from the sale of its Delaware timberland did not satisfy the transactional test for business income, but did satisfy the functional test, and thus was properly characterized as business income. *Glatfelter Pulpwood, supra* at 577–78. The court distinguished *Laurel Pipe* on its facts, determining that Appellant's sale of Delaware timberland did not constitute a liquidation of Appellant's business and did not change the scope of its

integrated business enterprise. *Glatfelter Pulpwood, supra* at 579. Recognizing that Appellant extensively managed its timberlands to maximize sustainable pulpwood yields, the court determined that Appellant's sale of the Delaware timberland was "part of the 'the management *or* the disposition of the property constituting an integral part of the taxpayer's regular trade or business operations management." *Id.* at 577–78 (citing 72 P.S. § 7401(3)2.(a)(1)(A)) (emphasis in original). Based on the parties' stipulations, the court concluded that Appellant "operated as a unitary whole; the activities in procuring pulpwood were integrated, involving pulp from timberland from a number of states to provide pulp for a paper mill in Pennsylvania; and the Delaware sale was not a liquidation but the disposition of property that was used in producing business income." *Id.* at 580.

Our disposition of this issue is controlled by the text of the statutory definition of business income. The parties and the Commonwealth Court all agree that the second phrase of this definition, which sets forth the functional test, is relevant here: business income "includes income from tangible and intangible property if **either** the acquisition, the management, **or** the disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations." 72 P.S. § 7401(3)2.(a)(1)(A) (emphasis added).[7] The General Assembly chose to employ the disjunctive conjunctions "either/or" in this definition, and its meaning is clear and unambiguous. For a gain from the sale of property to be classified as business income, the acquisition **or** the management **or** the disposition of that property must constitute an integral part of the taxpayer's business operations. Here, the Stipulations themselves establish this requirement.

As set forth in the Stipulations, Appellant acquired the Delaware timberland as part of its "timberland acquisition program," which was in place from the early 1960's to the late 1980's and encompassed acquisitions in four states, *i.e.*, Dela-

7. The Commonwealth does not argue that the transactional test, which is derived from the first phrase of the definition of business income, is satisfied here.

ware, Maryland, Pennsylvania, and Virginia. Stipulations at ¶ 11. The purpose of Appellant's timberland acquisition program was to guarantee a source of pulpwood for Parent and to serve as a hedge against the risk associated with any decline in the future availability of appropriately priced pulpwood on the open market. *Id.* at ¶ 12. As part of Appellant's "ongoing timberland management practice," Appellant's employees or third-party contractors plant, thin, and harvest timber, as well as monitor soil and water quality on the timberlands, in order "to maximize sustainable pulpwood yields." *Id.* at ¶ 15; *see also Glatfelter Pulpwood, supra* at 577. Appellant's sole business activity is to obtain pulpwood, partially from the timberlands that it owns, and to sell that pulpwood to Parent for use in its paper manufacturing operations. Stipulations at ¶¶ 5, 7–10.

Thus, Appellant's own Stipulations establish that the acquisition and the management of its Delaware timberland constitute integral parts of Appellant's regular business operations. Whether the disposition of the timberland was also an integral part of Appellant's regular business operations, pursuant to this Court's precedent in *Laurel Pipe*, is not a matter that we need reach because only the acquisition **or** the management **or** the disposition of the property at issue need be an integral part of the taxpayer's regular business operations under the plain text of the current statute. Accordingly, pursuant to the unambiguous statutory definition, Appellant's gain from the sale of its Delaware timberland constitutes business income.[8]

8. Appellant's attempt to distinguish income derived from the timberland and income derived from the timber produced on and harvested from the land is unavailing. *See* Appellant's Brief at 22 ("The Delaware timberlands themselves did not produce business income.... Rather, the cut timber sold as pulpwood produced the business income."). Appellant's harvest and sale of its own timber was inextricably intertwined with and fundamentally dependent upon its acquisition and management of the land on which the trees that produced the timber were grown.

Similarly, we must disagree with the dissent's statement that Appellant's sale of the timberland "included ... nothing related to the use of the land as a business asset." Dissenting Opinion at 276–77, 61 A.3d at 1013–14 (Eakin, J.); *see also id.* at 277, 61 A.3d at 1014 (describing the property sold as "just land" and determining that "land transactions

In its argument to the contrary, Appellant not only has misinterpreted this Court's holding in *Laurel Pipe* but also has ignored the clear import of the 2001 amendment to the statutory definition of business income. Contrary to Appellant's assertion, *see* Appellant's Reply Brief at 4, this Court did indeed parse, to the extent necessary, the statutory definition of business income in *Laurel Pipe*. As discussed above, the statutory definition applicable in *Laurel Pipe* was the pre–2001 version, requiring that "the acquisition, management, *and disposition* of the property constitute integral parts of the taxpayer's regular trade or business." *Laurel Pipe, supra* at 475 (quoting 72 P.S. § 7401(3)2.(a)(1)(A) (emphasis in *Laurel Pipe* opinion)). We concluded that the property at issue in *Laurel Pipe* was not disposed of as an integral part of the taxpayer's regular trade or business, and having resolved the matter on this basis, there was no need for us to address the acquisition or management of the property.

Thus, in *Laurel Pipe*, which was decided in 1994, our analysis and our holding were properly grounded in the statutory definition of business income that was in effect at that time, prior to the 2001 amendments. We did not, as Appellant suggests, "carv[e] out an exception" to the definition. Appellant's Reply Brief at 4. Rather, we decided *Laurel Pipe* based upon the prior definition of business income in effect at the time, and we decide the case now before us based upon the revised definition currently in effect. In sum, Appellant's net gain from the sale of the Delaware timberland constitutes business income, as that term is defined by the plain text of the current and only relevant definition.[9, 10]

were not part, much less an *integral* part, of [Appellant's] 'regular trade') (emphasis in original). The land at issue was timberland, *i.e.*, land used to grow trees harvested for Appellant's pulpwood business.

9. As mentioned in the text *supra*, we do not reach the question of whether, under this Court's precedent in *Laurel Pipe*, the disposition of the Delaware timberland constituted an integral part of Appellant's regular trade or business operations. However, we note that the Commonwealth Court distinguished *Laurel Pipe* on its facts. *Glatfelter Pulpwood*, 19 A.3d at 579. Appellant contends that, in distinguishing *Laurel Pipe*, the Commonwealth Court misstated or misinterpreted

■ In its second issue, Appellant contends that, even if the gain from the sale of Delaware timberland is classified as business income, it should not be subject to Pennsylvania corporate income tax because the Delaware timberland was unrelated to, and separate and distinct from, Appellant's regular business activities in Pennsylvania. Appellant's Brief at 35, 37. In Appellant's view, it engaged in two unrelated business enterprises: (1) its historical enterprise of "procuring and selling pulpwood" to Parent; and (2) its later enterprise, beginning in 2003, of "selling and liquidating its timberlands." *Id.* at 37 n. 22 and 38. Appellant reasons as follows: "[T]he cut timber [from land in Delaware and other states] was related to [Appellant's] procurement of pulpwood for sale in the Commonwealth, but the sale and liquidation of the Delaware [timberland] real estate itself are not organic, functional or integral parts of that activity." *Id.* at 39; *see also* Appellant's Reply Brief at 7 ("While sales of cut timber are related to [Appellant's] Pennsylvania activities, the sale of the Delaware timberlands themselves is not. Rather, the sale of the real estate generates income from a 'discrete' business enter-

some of the stipulated facts of the instant case. *See* Appellant's Brief at 25–28 (citing *Glatfelter Pulpwood,* 19 A.3d at 579).

It is clear to us that the Stipulations establish the following. Appellant's 2004 sale of Delaware timberlands was not a liquidation of a separate and distinct aspect of Appellant's business that changed the structure of the business. After the sale, Appellant's ongoing and integrated business of procuring pulpwood, both from its own timberlands and from the open market, continued. Appellant still owned substantial holdings of timberland, including 14,364 remaining acres of timberland in Delaware alone; 25,587 acres in Pennsylvania; and 40,676 acres in Virginia. Stipulation at ¶¶ 27–28. Appellant's stated goal in divesting certain of its timberlands was to "reduc[e] the percentage of pulpwood procured from company-owned timberland from approximately 25 percent to approximately 5 percent." *Id.* at ¶ 18. There is no indication that Appellant was withdrawing completely from the business activity of managing its own land for the growth of trees and the harvest of timber, to serve as a hedge against risk. *Id.* at ¶ 12. Thus, the circumstances of *Laurel Pipe* do not appear to be as factually similar to the circumstances of the instant case as Appellant asserts.

**10.** The dissent appears persuaded by Appellant's interpretation of *Laurel Pipe.* We must respectfully disagree. *See supra* n. 6 (explaining our disagreement with the dissent as to the interpretation of *Laurel Pipe* ).

prise unrelated to [Appellant's] procurement of pulp-wood. . . .").

In rejecting Appellant's arguments, the Commonwealth Court concluded that "the company operated as a unitary whole; the activities in procuring pulpwood were integrated, involving pulp from timberlands from a number of states to provide pulp for a paper mill in Pennsylvania; and the Delaware sale was not a liquidation but the disposition of property that was used in producing business income." *Glatfelter, supra* at 580.

Appellant relies primarily on *Commonwealth v. ACF Industries, Inc.*, 441 Pa. 129, 271 A.2d 273 (1970), to support its assertions. In *ACF*, the issue was whether ACF Industries, a New Jersey corporation, was subject to Pennsylvania corporate net income tax on its gain from the sale of certain securities. ACF Industries' Pennsylvania business activities included the manufacture and repair of tank cars, the manufacture of pressed steel, and the sale of some products manufactured outside of the state. *Id.* at 274. In 1960, ACF Industries was interested in exploring a merger with or acquiring the assets of Republic Aviation Corporation, and accordingly took advantage of an opportunity to purchase shares of Republic Aviation's stock. Sixteen months later, ACF Industries sold its Republic Aviation stock after deciding against acquisition of or merger with that corporation. ACF Industries reaped a net gain from the sale, but it excluded all of the gain when reporting its corporate net income to Pennsylvania based on the theory that the gain constituted income from an asset unrelated to its Pennsylvania activities. *Id.* at 275.

This Court agreed, explaining that exclusion of income may properly be claimed when "the taxpayer either (1) is engaged in a separate business outside of Pennsylvania (the so-called "multiform" concept) or (2) owns an asset or assets unrelated to the exercise of its franchise or the conduct of its activities in Pennsylvania (the so-called "unrelated asset" concept)." *Id.* at 276. We determined that our prior cases revealed "a consistent attempt to allocate to Pennsylvania that fair share of

value or income reflective of activity here and to exclude value or income not contributing to the exercise of the Pennsylvania franchise." *Id.* at 279. We also recognized that multiform or unrelated asset cases were highly dependent upon factual consideration, rendering each case "unique." *Id.* at 279–80. However, we summarized the clear legal principles in this area as follows:

> First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this State, the factors attributable to the outside activity may be excluded.
>
> Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this context.
>
> Third, without attempting to preclude exclusion in any given case, we reiterate ... that the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division and partial exclusion.

*Id.* at 280.

Relying on our holding and explication of legal principles in *ACF*, Appellant now asserts that its Delaware timberland was an "unrelated asset" because it had no relationship to Appellant's business activities in Pennsylvania; furthermore, Appellant asserts that the sale of the Delaware timberland constituted a second business enterprise, separate and distinct from Appellant's historical enterprise of procuring and selling pulpwood. Appellant's Brief at 35, 37 & n. 22, 38–39. Because Appellant has misconstrued *ACF*, incorrectly applying that precedent to the factual circumstances of this case, we cannot agree.

As we have already discussed in our resolution of Appellant's first issue, Appellant acknowledged the following in its Stipulations. Appellant acquired the Delaware timberland at issue, as well as timberlands in three other states, as part of a three-decade-long timber acquisition program designed to guarantee a source of pulpwood for its "sole business activity," which is to procure pulpwood at the lowest possible cost for Parent's Pennsylvania paper mill. The timberlands served a "hedging" function against risk associated with decreased availability or increased cost of pulpwood on the open market. As part of Appellant's business activities, Appellant extensively managed its timberlands, hiring employees or third-party contractors to plant, thin, and harvest timber and to monitor soil and water quality in order to maximize sustainable pulpwood yields. In 2003, Appellant made a strategic corporate decision to divest some of its timberland holdings, thereby reducing the percentage of total pulpwood procured from Appellant-owned timberland and increasing the percentage procured from the open market. Appellant reports to Pennsylvania all income generated by sales of pulpwood, whether harvested from its own timberlands or obtained from third parties, as apportionable business income. Stipulations at ¶¶ 5, 7, 9–12, 15, 16, 18, 22, 23, 28, 32.

From the stipulated facts, we readily conclude that Appellant's Delaware timberland was integrally related to Appellant's business activities in Pennsylvania. It is undisputed that Appellant grew pulpwood on the Delaware timberland; harvested pulpwood from the Delaware timberland; and sold pulpwood from the Delaware timberland to Parent, a Pennsylvania corporation, for the manufacture of its specialty paper products in Pennsylvania; it is also undisputed that Appellant earned income from those sales. *Id.* at 3, 5, 9–10, 15–17, 32. The timberlands were not converted to an "unrelated asset" merely by virtue of the fact that Appellant made a strategic business decision to sell them. Furthermore, Appellant's decision to sell the timberlands did not constitute the commencement of a second, separate business enterprise. By Appellant's own admission, the sale of the timberlands was a

"strategic corporate decision," not a segue into the unrelated business of selling real estate. *Id.* at 18. Appellant's arguments fail, and it is entitled to no relief on its second issue.

■ In its third and final issue, Appellant asserts that taxation in Pennsylvania of the net gain from the sale of Delaware timberland is unfair and unreasonable and thus violates the Due Process and Commerce Clauses of the United States Constitution. Appellant's Brief at 40. Appellant contends that it has been unconstitutionally subjected to duplicative taxation on a portion of its net gain from the sale of timberland because Delaware and Pennsylvania impose taxation on, respectively, 100% and 42% of the net gain. *Id.* at 12, 46–49. In Appellant's view, the application of Pennsylvania's apportionment formula in this instance "unreasonably and arbitrarily [ ] attribut[es] to the Commonwealth an amount of income which is out of all proportion to the business transacted by [Appellant] in the state." *Id.* at 47–49; *see also id.* at 47 (asserting that, by apportioning 42% of Appellant's gain from the sale of its Delaware timberland, the Commonwealth "greatly distorts the amount of new income which was earned by [Appellant] in respect of its sales transactions and business activities in the Commonwealth"). Appellant further argues that its sale of Delaware timberland was a discrete business activity unrelated to its pulpwood sales transactions in Pennsylvania, and that Pennsylvania provides no services, such as fire or police protection, highways, sewer, water, recording of deeds, or judicial enforcement, with respect to the Delaware timberland. *Id.* at 43 n. 25, 46, 48. In addition, Appellant asserts that the Delaware timberland holdings "also serve to some extent as an 'investment function,' rather than an operational function," and thus the gain from their sale should not be apportionable to Pennsylvania. *Id.* at 46.

The Commonwealth responds that Appellant operates as a unitary business, with the pulpwood grown on and harvested from the timberlands in Delaware and other states forming a part of Appellant's integrated pulpwood procurement enterprise. Commonwealth's Brief at 19–20. The Commonwealth points out that Pennsylvania "preserves and fosters the mar-

ket" for nearly 100% of Appellant's sales, maintains infrastructure, and is Appellant's headquarters.

The Commonwealth Court held that neither the Due Process Clause nor the Commerce Clause precluded Pennsylvania from taxing the gain from Appellant's Delaware timberland sale, despite Delaware's concurrent taxation. The Commonwealth Court observed that "the Commonwealth is home to [Appellant] and its Parent, [Appellant] has timberland in Pennsylvania and uses the Pennsylvania infrastructure to deliver the pulpwood to Pennsylvania; [Appellant] does not just have some tangential relationship to the state that would establish that the tax is not fairly related to the services it receives from Pennsylvania." *Glatfelter Pulpwood, supra* at 581. The Commonwealth Court concluded as follows:

> The Commonwealth need only consider what activities [Appellant] conducts in Pennsylvania that have some connection to its activities in Delaware. Because ... the 2004 Delaware [timberland sale] had a relationship to the business activities in Pennsylvania and was properly apportioned for taxes in Pennsylvania, there was no violation of the Due Process or Commerce Clause.

*Id.* at 581–82.

 "Under both the Due Process and the Commerce Clauses of the [United States] Constitution, a state may not, when imposing an income-based tax, tax value earned outside its borders." *Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159, 164, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (citation and quotation marks omitted); *see also Allfirst Bank v. Commonwealth*, 593 Pa. 631, 933 A.2d 75, 77 n. 4 (2007) ("[U]nder the Commerce and Due Process Clauses of the U.S. Constitution, states may only impose taxes on value attributable to in-state business activity.") (internal citation omitted). Businesses that operate in multiple states are not immune from fairly apportioned state taxation, however, and numerous opinions from the United States Supreme Court have considered how to accommodate the legitimate interests of the states in taxing business income derived from in-state activity in light of the constraints mandated by the Due

Process Clause and/or Commerce Clause. *Mobil Oil Corp. v. Commissioner of Taxes of Vermont,* 445 U.S. 425, 436, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980).

As the High Court has made clear, to calculate the in-state income of a multistate enterprise for taxation purposes, a state is not required to isolate those income-producing activities that physically occur within its borders; rather, a state may tax a fairly apportioned share of the total income of a multistate enterprise if that enterprise constitutes a "unitary business." *MeadWestvaco ex rel. Mead Corp. v. Illinois Dept. of Rev.,* 553 U.S. 16, 19, 26, 128 S.Ct. 1498, 170 L.Ed.2d 404 (2008); *see also Allied–Signal, Inc. v. Director, Division of Taxation,* 504 U.S. 768, 772, 778, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (stating that, under the unitary business principle, states are permitted "to tax a corporation on an apportionable share of the multistate business carried on in part in the taxing State"); *ASARCO Incorporated v. Idaho State Tax Commission,* 458 U.S. 307, 320 n. 14, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982) (recognizing that the unitary business principle has been a familiar concept in Supreme Court jurisprudence for over 60 years and concluding, from a review of numerous cases, that "formulary apportionment, which takes into account the entire business income of a multistate business in determining the income taxable by a particular state, is constitutionally permissible only in the case of a unitary business") (citation omitted).

A "unitary business" is defined as "an enterprise which carries out distinct multijurisdictional activities resulting in ultimate profit or value derived from the entire business operation." *Unisys Corporation v. Board of Finance & Revenue,* 571 Pa. 139, 812 A.2d 448, 454 (2002). In many instances, the question of whether an enterprise is a unitary business has arisen in the context of a parent corporation and its subsidiaries, acquisitions, and/or affiliates. In such cases, the United States Supreme Court has described the "hallmarks" of a unitary relationship as "functional integration, centralized management, and economies of scale." *MeadWestvaco, supra* at 30, 128 S.Ct. 1498; *see also Allied–Signal, supra* at 773–74,

781, 783, 112 S.Ct. 2251; *Container Corporation, supra* at 179, 103 S.Ct. 2933; *Mobil Oil, supra* at 438, 100 S.Ct. 1223. In contrast to the constitutionally permissible taxation of a fairly apportioned share of a unitary business's income, it is not permissible for a state to tax value derived from "unrelated business activity" constituting a "discrete business enterprise" conducted out of state. *MeadWestvaco Corp., supra* at 25, 26, 128 S.Ct. 1498.

A state calculates the in-state share of income generated by a multi-state, unitary business via the application of an apportionment formula, which has been explained by the United States Supreme Court as follows.

> The unitary business/formula apportionment method ... calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. [The United States Supreme] Court long ago upheld the constitutionality of the unitary business/formula apportionment method, although subject to certain constraints.

*Container Corp., supra* at 165, 103 S.Ct. 2933; *see also Exxon Corporation v. Wisconsin Department of Revenue,* 447 U.S. 207, 223, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (describing the unitary business principle as "the linchpin of apportionability for state income taxation of an interstate enterprise," and reiterating that, for a unitary business, "a State may apply an apportionment formula to the [taxpayer-business's] total income in order to obtain a rough approximation of the corporate income that is reasonably related to the activities conducted within the taxing State") (quotation marks and citation omitted).

The High Court has explained that the Due Process Clause and the Commerce Clause "impose distinct but parallel limita-

tions on a State's power to tax out-of-state activities." *Mead-Westvaco Corp., supra* at 24, 128 S.Ct. 1498.

> The Due Process clause demands that there exist some definite link, some minimum connection, between a state and the person, property, or transaction it seeks to tax, as well as a rational relationship between the tax and the values connected with the taxing state. The Commerce Clause forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. The broad inquiry subsumed in both constitutional requirements is whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state—that is, whether the state has given anything for which it can ask return.

*Id.* at 24–25, 128 S.Ct. 1498 (internal citations and quotation marks omitted).

With regard specifically to the nexus mandated by due process, the High Court has stated the following:

> The requisite "nexus" is supplied if the corporation avails itself of the substantial privilege of carrying on business within the State; and the fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction.

*Mobil Oil, supra* at 437, 100 S.Ct. 1223 (citation and quotation marks omitted).

 Under both the Due Process and Commerce Clauses, application of an apportionment formula to a multi-state unitary business must be "fair." *Container Corp., supra* at 169, 103 S.Ct. 2933. The High Court has made clear that it "will strike down the application of an apportionment formula if the taxpayer can prove by clear and cogent evidence that the income attributed to the State is in fact out of all appropriate proportions to the business transacted in that State or has led to a grossly distorted result." *Id.* at 170, 103 S.Ct. 2933 (internal citations and quotation marks omitted). However,

the High Court has also made clear that an apportionment formula is not constitutionally invalid "whenever it *may* result in taxation of some income that did not have its source in the taxing State." *Id.* at 169–70, 103 S.Ct. 2933 (emphasis in original). The High Court has specifically stated that, even if the state in which an enterprise earned specific income can be ascertained by geographical accounting, another state is not barred from imposing a tax on an appropriate portion of that income, if the enterprise involved was a multi-state unitary business. *Mobil Oil, supra* at 438, 100 S.Ct. 1223.

In addition, the application of an apportionment formula does not offend the Commerce Clause merely because in certain instances it results in double taxation of the same income. *Container Corp., supra* at 170–71, 103 S.Ct. 2933. The High Court recognized that, to eliminate all possibility of double taxation, it would have to mandate a single method of taxation of multi-state businesses and then dictate the rules regarding application of its chosen method. *Id.* Concluding that the Constitution "is neutral with respect to the content of any uniform rule," the High Court explained that the delineation of a uniform rule constitutes a policy decision, and as such, rests within the power granted to Congress as the legislative branch, not to the Court. *Moorman Manufacturing Co. v. Bair,* 437 U.S. 267, 279–80, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *see also Container Corp., supra* at 170–71, 103 S.Ct. 2933. As stated in *Allied–Signal, supra* at 784, 112 S.Ct. 2251 the High Court's precedent "gives[s] States wide latitude to fashion formulae designed to approximate the instate portion of value produced by a corporation's truly multi[-]state activity." Thus, the High Court has declined to impose a single apportionment formula on the states, while nonetheless recognizing that double taxation will at times occur.

When a multi-state business claims that a state income tax violates the Due Process or Commerce Clause, "the taxpayer has the distinct burden of showing by clear and cogent evidence that the state tax results in extraterritorial

values being taxed." *Container Corp., supra* at 164, 103 S.Ct. 2933 (internal quotation marks and citations omitted); *see also Unisys Corporation, supra* at 465 ("[A] taxpayer alleging Commerce and Due Process Clause violations bears a substantial burden to demonstrate by clear and cogent evidence that the state is taxing income earned outside its jurisdiction."). Furthermore, "in order to exclude certain income from the apportionment formula, the [taxpayer-business] must prove that the income was earned in the course of activities unrelated to those carried out in the taxing State." *Allied–Signal, supra* at 787, 112 S.Ct. 2251 (citing *Exxon, supra* at 223, 100 S.Ct. 2109).

Here, Appellant does not challenge the fairness of Pennsylvania's apportionment formula on its face. Rather, Appellant asserts that application of the apportionment formula to the gain from the sale of Appellant's Delaware timberland is unfair because there is no rational relationship between the sale and Appellant's Pennsylvania operations or activities, and because the income attributed to Pennsylvania is out of all proportion to the business Appellant transacts in Pennsylvania. Appellant's Brief at 40, 43 n. 25, 46–48; Appellant's Reply Brief at 8, 10.

Initially, we conclude, in agreement with the Commonwealth Court, that Appellant is a unitary business. Appellant's enterprise operates as an integrated whole, with the sole business activity of procuring pulpwood for Parent. Stipulations at ¶ 5. Except for isolated and unpredictable instances, all pulpwood procured by Appellant, whether grown on and harvested from Appellant's own timberland or purchased from third parties on the open market, is sold to Parent in Pennsylvania for processing in Parent's Pennsylvania paper mill. *Id.* at ¶¶ 5, 10. Appellant's timberlands, including the specific Delaware timberland at issue, were acquired to guarantee a source of pulpwood for Parent, and were managed by Appellant to maximize sustainable yields of pulpwood. *Id.* at ¶¶ 11–12, 15–16. All of Appellant's business activities are directed toward a single end—the sale of pulpwood to Parent—generating an ultimate profit derived from the entire business

operation as a whole. Thus, Appellant is properly character-
ized as a unitary business, and, as such, Appellant is properly
subject to corporate income tax in Pennsylvania as calculated
pursuant to the state's apportionment formula.[11]

Appellant's argument that it has been subjected to unconsti-
tutional double taxation by the application of Pennsylvania's
apportionment formula is unsupported by precedent from the
United States Supreme Court or this Court. Appellant af-
fords great significance to the fact that Pennsylvania is impos-
ing an income tax on a portion of Appellant's net gain that
Delaware has taxed in its entirety. However, the High Court
has declined to conclude that a fairly apportioned tax was
unconstitutional merely because in certain instances it led to
double taxation. *See Container Corp., supra* at 170–71, 103
S.Ct. 2933; *Moorman Manufacturing, supra* at 278–80, 98
S.Ct. 2340. As the High Court has stated, "[a]t least in the
interstate commerce context, [ ] the anti-discrimination princi-
ple [under the Commerce Clause] has not in practice required
much in addition to the requirement of fair apportionment."
*Container Corp., supra* at 171, 103 S.Ct. 2933.

Appellant also contends that application of Pennsylvania's
apportionment formula to the gain on the sale of the Delaware
timberland is not fair, and to support that contention, makes
several arguments, which we address in turn. First, Appel-
lant argues that there is no rational relationship between the
sale of Delaware timberland and Appellant's business activi-
ties in Pennsylvania, which consist of selling pulpwood to
Parent. We cannot agree for the same reasons as discussed
in Issue 2. The timberlands owned by Appellant in Delaware
and other states, are the direct sources of some of the
pulpwood procured for and sold to Parent in Pennsylvania for
use in Parent's paper mill in Pennsylvania. Stipulations at
¶¶ 8–12. The timberlands were acquired as a hedge against
business risks. *Id.* at ¶ 12. Appellant extensively manages

11. Appellant does not appear to dispute that it is a unitary business, but
 it argues that the sale of Delaware timberland was outside the scope of
 its unitary business. *See, e.g.*, Appellant's Reply Brief at 11 ("Here, the
 unitary business conducted by [Appellant] would not have had any
 impact on the value of the Delaware [timberland] property.").

the timberlands in order to maximize sustainable pulpwood yields and ensure a sufficient source of pulpwood for Parent's needs. *Id.* at ¶¶ 12, 15–16. The sale of the Delaware timberland at issue was the result of Appellant's strategic corporate decision to divest itself of certain timberlands and decrease the percentage of pulpwood obtained from company-owned lands. *Id.* at ¶ 18. There is indisputably a rational relationship between Appellant's out-of-state timberlands, including their ultimate disposition, and Appellant's unitary business activities in Pennsylvania.

Appellant next claims that the application of Pennsylvania's apportionment formula is unfair because the income thereby attributed to Pennsylvania from the sale of the Delaware timberland is out of all proportion to Appellant's activities in Pennsylvania, and because Pennsylvania provides no services or benefits in exchange for the exercise of its taxing power. By limiting its focus to the geographical location of the specific timberland at issue, Appellant fails to consider its numerous activities in Pennsylvania and the considerable benefits it receives from Pennsylvania, as recognized by the Commonwealth Court. *Glatfelter Pulpwood, supra* at 581. The centrality of Pennsylvania to Appellant's unitary enterprise is illustrated by the location of its headquarters—in Spring Grove, Pennsylvania, the same town where Parent operates a paper mill. Stipulations at ¶¶ 1, 9. Except for isolated and unpredictable transactions, all of Appellant's sales of pulpwood—its sole product—are in Pennsylvania, to a Pennsylvania customer (Parent), for processing in Pennsylvania. *Id.* at ¶¶ 3, 5, 10. Thus, as the Commonwealth observes, Pennsylvania "preserves and fosters the market for 100%, save [a] small exception, of [Appellant's] sales." Commonwealth's Brief at 20. Pennsylvania also maintains infrastructure for transport of Appellant's product and personnel, and provides protection for Appellant's transactions, activities, and headquarters. Appellant has not established that the income attributed to Pennsylvania from the sale of Appellant's Delaware timberland parcel is out of proportion to Appellant's activities in Pennsylvania.

Finally, Appellant asserts that the timberlands in Delaware and other states "serve to some extent as an 'investment function.'" Appellant's Brief at 46. Appellant attempts to rely on *Allied–Signal, supra,* and *MeadWestvaco, supra,* to argue that, because its timberland holdings were "investments," any gain from the sale of Delaware timberland should not be apportionable to Pennsylvania as income. Appellant's reliance on *Allied–Signal* and *MeadWestvaco* is misplaced, and Appellant's characterization of its timberland as an investment is directly contrary to its own stipulations.

The issue in *Allied–Signal* was whether one corporation's gain on the sale of its stock interest in another corporation was subject to apportionment for taxation purposes under the unitary business principle. *Allied–Signal, supra* at 773, 112 S.Ct. 2251. The High Court determined that the two corporations were unrelated business enterprises having nothing to do with one another, and did not operate as a single, integrated, unitary business. Accordingly, the High Court concluded that the stock interest was properly considered as a passive investment and not an integral operational one. *Id.* at 788, 112 S.Ct. 2251. Because the two corporations did not comprise a unitary business, the gain on the sale of the stock was not apportionable. *Id.* at 789–90, 112 S.Ct. 2251.

In *MeadWestvaco, supra* at 20–22, 128 S.Ct. 1498, the issue was whether Mead Corporation's gain from the sale of Lexis/Nexis, a subsidiary/division, was subject to apportionment. The trial court held that, although Mead and Lexis/Nexis did not constitute a unitary business, Mead's gain from the sale of Lexis/Nexis was apportionable because Lexis/Nexis served an "operational function" in Mead's business. *Id.* at 23, 128 S.Ct. 1498. The High Court rejected this analysis, cautioning that the concept of "operational function" is useful only insofar as it may shed light on whether an asset is part of a taxpayer's unitary business. *Id.* at 29, 128 S.Ct. 1498. The High Court emphasized that the constitutionally relevant question was, and remains, whether the asset at issue "was a unitary part of the business being conducted in the taxing State rather than a

discrete asset to which the State had no claim." *Id.* at 29–30, 128 S.Ct. 1498.

Here, as we have discussed in the text above, the Stipulations establish that Appellant's timberlands were integral operational assets of Appellant's unitary business. The timberlands could in no sense be characterized as passive investments comparable to the acquisitions at issue in *Allied–Signal* and *MeadWestvaco*, and thus these decisions afford Appellant no relief.

Concluding that none of Appellant's issues entitle it to any relief, we affirm the order of the Commonwealth Court.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justice SAYLOR and BAER and Justice TODD join the opinion.

Justice EAKIN files a dissenting opinion.

Justice EAKIN, dissenting.

I find this case controlled by the precedent of *Laurel Pipe Line Company v. Commonwealth of Pennsylvania, Board of Finance and Revenue*, 537 Pa. 205, 642 A.2d 472 (1994). Laurel was an Ohio corporation that operated pipelines from Philadelphia to Pittsburgh and intermediate points. It sold the Aliquippa to Cleveland pipeline, including "related equipment, land, rights of way, buildings, oil tanks, and similar real and personal property"; however, Laurel continued to operate other pipelines. *Id.*, at 473 n. 1. While use of Laurel's pipelines was the very asset that generated its income, this Court found this was not a disposition in the regular course of Laurel's business, and thus was taxable as non-business income rather than business income.

If anything, the facts here are stronger here than those in *Laurel.* The present sale was of a single parcel of out-of-state land, not an extended property in Pennsylvania. The sale included no business accoutrements, no related equipment or rights of way, and nothing related to the use of the land as a

business asset; in *Laurel*, the pipeline was *only* useful as a business asset. It was just land, and land transactions were not part, much less an *integral* part, of the "regular trade" of the seller, which was a very focused trade—acquiring and selling pulpwood. I find no reason to distinguish or reject the precedent of *Laurel*.

The majority does so based largely on the amendments to the relevant statutory definition of business income since *Laurel* was decided. The legislature's decision to reframe a portion of the definition in the disjunctive is emphasized at length. *Laurel*, however, was not based on the conjunctive nature of that language. Indeed, it was not based on that portion of the definition at all—the court quotes the definition of course, but never mentions the conjunctive framing of the three words. Changing to the disjunctive did absolutely nothing to alter the reasoning of the court, which properly focused on whether the transaction was an integral part of Laurel's regular trade or business.

While the amendments are irrelevant to the analysis, if anything, they undermine the very application of the "function" test on which the majority relies. Majority Op., at 257–59, 61 A.3d at 1002–03. That test was first mentioned in Pennsylvania in *Welded Tube Company of America v. Commonwealth of Pennsylvania*, 101 Pa.Cmwlth. 32, 515 A.2d 988 (1986). This "alternate" test is not at all obvious from the language of the definition—it is acknowledged to be an interpretation of the second clause of the definition. *See id.*, at 993–94. Other authorities do not find such a test, and deem this clause to be merely clarifying language modifying the substantive first clause. However, I acknowledge this Court approved of the test in *Ross–Araco Corp. v. Commonwealth of Pennsylvania, Board of Finance and Revenue*, 544 Pa. 74, 674 A.2d 691, 694 (1996).

What is worth noting is that the amending of the statutory language on which the majority relies so heavily is a change to the very language from which the function test was divined. The amendment does not address the analysis of *Laurel*—what it does is modify the language on which the function test is based. If anything, a significant change to that language

suggests a need to reexamine the continued viability of a test which is based on the pre-amendment language. Where a test is an interpretation of a clause that is subsequently changed, it is the test itself that is in question.

In fact, the application of this part of the definition was not a problem in need of legislation—no case is cited where outcomes resulted from a court requiring all three factors (conjunctively), rather than only one (disjunctively). No case is cited where these three factors are in play at all—Glatfelter acquired, managed, and disposed of the land, just as Laurel acquired, managed, and disposed of the pipeline. Instead, every discussion of the function test revolves around the "integral parts" language—this is the language that is emphasized by the court in *Welded Tube,* where it is first mentioned, and again when the test was adopted in *Laurel* and *Ross–Araco.* Not one of these opinions discusses, much less relies upon, the "acquisition, management, disposition" language.

Therefore I would reverse on the authority of *Laurel.* As this would resolve the matter in favor of appellant, I offer no opinion on the second or third issues raised.[1]

---

1. However, while some duplicative taxation has been found acceptable by the United States Supreme Court, I suggest the line of constitutional acceptability should be drawn somewhere short of taxing 142% of the sale proceeds as was the result here.